609 F.2d 1368
 101 L.R.R.M. (BNA) 2875, 84 Lab.Cas. P 10,774,
86 Lab.Cas. P 11,469, 1978-2 Trade Cases 62,184,
1979-2 Trade Cases 62,783
 LARRY V. MUKO, INC., Appellant,
v.
SOUTHWESTERN PENNSYLVANIA BUILDING AND CONSTRUCTION TRADES
COUNCIL, Long John Silver's Inc., and Building and
Construction Trades, Council of
Pittsburgh, Pennsylvania, and Vicinity.
 No. 77-2259.
 United States Court of Appeals,
Third Circuit.
 Argued May 24, 1978.
Reargued En Banc May 17, 1979.
Decided July 20, 1979.
 
 Robert A. King (argued), Melvin L. Moser, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for Larry V. Muko, Inc.
 Stanford A. Segal (argued), Gatz, Cohen, Segal & Koerner, Pittsburgh, Pa., for Southwestern Pennsylvania Building and Construction Trades Council and Building and Construction Trades Council of Pittsburgh, Pennsylvania, and Vicinity.
 Gilbert J. Helwig, John T. Tierney, III (argued), Joseph E. Camp, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Long John Silver's Inc.
 Baker Armstrong Smith, Atlanta, Ga., Thomas J. Brackett, Center on National Labor Policy, Arlington, Va., for amicus curiae.
 Argued May 24, 1978
 Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.
 Reargued en banc May 17, 1979
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 Larry V. Muko, Inc. (Muko), a Pennsylvania corporation engaged in the general contracting business, appeals from an order granting defendants' Fed.R.Civ.P. 50(a) motion for a directed verdict in an antitrust action seeking damages and injunctive relief under §§ 4, 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. The defendants are Long John Silver's Inc. (Silver's), a fast-food seafood restaurant chain, and two labor organizations, the Southwestern Pennsylvania Building and Construction Trades Council (Southwestern Council) and the Building and Construction Trades Council of Pittsburgh, Pennsylvania and Vicinity (Pittsburgh Council). We reverse and remand for a new trial.
 
 I.
 
 2
 Muko is a nonunion general contractor. Its complaint charges that Silver's entered into an agreement with the defendant labor organizations that it would not award building and construction contracts to any contractor that was not a party to a current collective bargaining agreement with member unions of either the Southwestern Council or the Pittsburgh Council. The defendants' motions for a directed verdict were granted at the end of the plaintiff's case. The grant of those motions was proper only if, without weighing the credibility of witnesses, as a matter of law, there could be only one reasonable conclusion as to a verdict. Thus we must determine what, from Muko's evidence, a jury might have found.
 
 
 3
 The jury could have found as follows: Silver's is a national chain of fast-food seafood restaurants with its headquarters in Kentucky. In 1973, when it first decided to enter the fast-food seafood business in Western Pennsylvania, Silver's contracted with Muko, after competitive bidding, for the construction of a restaurant in Monroeville, a Pittsburgh suburb. Muko was an experienced builder of fast-food restaurants. In 1973 it was Silver's policy to solicit bids on a competitive basis without regard to whether the contractor used union labor. The Monroeville site was picketed during construction by Council pickets. After the restaurant opened, Council representatives leafleted its patrons, asking them to refrain from patronizing Silver's because it used contractors who were paying less than the established prevailing construction wages in the area. Muko was also awarded a contract for the construction of a Silver's restaurant in Lower Burrell, and commenced construction there about the time the Monroeville restaurant opened.
 
 
 4
 Faced with handbilling at the completed Monroeville restaurant, and fearful of new picketing at the Lower Burrell construction site, Silver's approached the Councils and arranged for a meeting. On November 1, 1973, a meeting took place between Silver's vice president for real estate, its local real estate agent, and three council representatives. Silver's vice president said that he wanted the leafleting to end as quickly as possible. One of the Council representatives stated that he wanted future restaurants built by union labor. Another union representative gave Silver's vice president a form of contract used between the Councils' local unions and union contractors in the area, and supplied Silver's with a list of contractors with whom the local unions had collective bargaining agreements. A Council representative stated there would be no picketing or leafleting at Lower Burrell, the second Silver's location, pending a decision on the use of union contractors at future construction sites.
 
 
 5
 Silver's representatives left the meeting with the form contract and the list of union contractors. Within a week Silver's vice president for development sent the Councils a letter. The letter began by emphasizing Silver's desire "to establish good working relationships" with unions in the Pittsburgh area. It noted that the form contract was specifically designed for use by area contractors and local trade unions. But, the writer continued:
 
 
 6
 I believe that we can serve the same purpose with this letter to show intent that Long John Silver's, Inc., plans to use only union contractors certified by the affiliated Building and Construction Trades Councils of Pittsburgh and Allegheny Kiski Valley and vicinity. We will also request that all the investors (property owners) developing for us use union contractors. By operating in this manner, we will accomplish a good working relationship with you. We have visited several of the contractors, the names of which we mentioned to you. As soon as we have firm bids on several construction sites, we will contact you to insure that these contractors are in good standing with the union.
 
 
 7
 In any relationship between two parties there must be mutual need and assistance. . . . It is . . . extremely important to both parties that our location at Monroeville, Pennsylvania and the one under construction in Lower Burrell Township, Pennsylvania not be subjected to any kind of informational picketing.
 
 
 8
 Silver's had been satisfied with Muko's work at Monroeville, and had therefore contracted with Muko for erection of the second restaurant at Lower Burrell. The president of Silver's had told Muko it could construct all the chain's restaurants in Western Pennsylvania if it continued to offer high-quality work at competitive prices. After the meeting of November 1, 1973, Silver's asked Muko if it would build as a union contractor. It refused to do so, and subsequently was not asked to bid on any further jobs for Silver's. By the trial date twelve other restaurants had been built, all by union contractors whose prices for those twelve restaurants aggregated over $250,000 more than Muko would have charged. Muko's bids and cost estimates for these twelve restaurants projected a profit even at its lower bid prices.
 
 
 9
 Muko's operation involved only a handful of construction employees, who functioned primarily as supervisors. The bulk of the work on its jobs was performed by subcontractors. Neither the Pittsburgh Council nor the Southwestern Council had any interest in or made any attempt to organize Muko's employees. Neither council ever represented those employees. Muko made a tender of proof that it was paying prevailing wage rates to its supervisory employees. The district court rejected the tender on the ground that it was irrelevant in the plaintiff's case, but suggested that it might be offered later, depending on the defendants' evidence. On this record we must therefore assume that Muko was paying those employees prevailing rates. There is no evidence in the record regarding the wage rates paid by Muko's subcontractors.
 
 
 10
 The defendants stipulated that Muko could prove the requisite jurisdictional relationship to interstate commerce and that direct out-of-state purchases would, had Muko obtained the additional contracts, have exceeded $50,000.
 
 
 11
 In face of the foregoing evidence the district court granted defendants' Rule 50(a) motions. No opinion was written, but the transcript of proceedings discloses that the directed verdict was granted solely because the court believed the evidence could sustain no finding other than a unilateral decision on the part of Silver's to accept bids only from union contractors.
 
 II.
 
 12
 Clearly the directed verdict cannot be affirmed on the ground upon which the district court acted. Looking at the evidence, and particularly the letter of November 7, 1973, in the light most favorable to Muko, reasonable jurors could find that Silver's and the Councils agreed that, in consideration of the Councils refraining from informational picketing and leafleting directed at the Monroeville and Lower Burrell restaurants, Silver's would use, for the restaurants yet to be constructed, contractors with whom Council local unions had collective bargaining agreements. Since the jury could have found such an agreement, we cannot sustain the grant of a directed verdict on the theory that the only activity which Muko proved was a unilateral appeal to an employer for the exercise of managerial discretion. See NLRB v. Servette, Inc., 377 U.S. 46, 54, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). Moreover, although the Councils argue on appeal that Muko failed to prove an injury to its business or property within the meaning of § 4 of the Clayton Act, that argument cannot prevail on the record before us. The jury could have found that but for the agreement to exclude nonunion contractors Muko would have been the low bidder on twelve restaurant jobs and would have made a profit on each. Finally, because of the parties' stipulation, we must assume that the twelve construction projects involved a substantial amount of interstate commerce. Since Muko established injury to its business or property and the contract which the jury could have found affected a significant amount of interstate commerce, the directed verdict can only be sustained if as a matter of law the agreement reached (1) was exempt from antitrust scrutiny, or (2) was lawful under the antitrust laws. We emphasize that in the procedural posture of this case we deal only with the narrow question whether any agreement which the jury might have found must be found to be exempt or legal for antitrust purposes.
 
 III.
 
 13
 Because the jury could have found concert of action between Silver's and the Councils, neither the Clayton Act, §§ 6 and 20, 15 U.S.C. § 17,29 U.S.C. § 52, nor the Norris-LaGuardia Act, §§ 4, 5, and 13, 29 U.S.C. §§ 104, 105, 113, provide any statutory exemption from antitrust liability. See United Mine Workers v. Pennington, 381 U.S. 657, 662, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Thus any immunity from antitrust coverage must be found in the nonstatutory exemption. Moreover, the agreement which could have been found was outside the context of a collective bargaining relationship. Thus the significant labor law factors arising from that relationship to which we gave special deference in Consolidated Express, Inc. v. New York Shipping Association, Inc., 602 F.2d 494 (3d Cir. 1979), are not present here. Accord, Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 625-26, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). We must turn for guidance, therefore, to Connell, the one case in which the Supreme Court has dealt with an agreement, not in the collective bargaining context, between a labor union and a business organization. Connell recognized the possibility that agreements between labor unions and business organizations outside the collective bargaining context might be exempt, but held that the exemption was unavailable on the facts of that case. Unlike this case, Connell was before the Supreme Court after a full trial. Thus the Court was in a position to hold that nonstatutory labor exemption was unavailable as a matter of law. In the posture of this case, we need not reach so broadly. But if the jury could from the plaintiff's evidence have found facts falling within the principles established in Connell, we must remand for a new trial.
 
 
 14
 In Connell a labor union for one of the construction industry sub-trades had successfully used informational picketing to force a number of general contractors, with which it had no collective bargaining relationship, to agree to subcontract in that sub-trade only to subcontractors with whom the union had a current collective bargaining agreement. Connell, a general contractor who had been soliciting subcontract bids on a competitive basis without regard to union status, signed the tendered agreement under duress, and then sued for declaratory and injunctive relief, claiming that the agreement violated section 1 of the Sherman Act. The union argued that the agreement was exempt for two reasons: (1) it was directly related to the valid union goal of organizing as many subcontractors as possible; and (2) it was expressly authorized by the construction industry proviso to § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) (1976). The Court rejected both arguments.
 
 
 15
 Local 100 first contended that the agreement was protected by the nonstatutory exemption from the antitrust laws because, although entered into outside the collective bargaining context, it advanced the union's valid organizational objective. Rejecting that contention Justice Powell wrote:
 
 
 16
 This record contains no evidence that the union's goal was anything other than organizing as many subcontractors as possible. This goal was legal, even though a successful organizing campaign ultimately would reduce the competition that unionized employers face from nonunion firms. But the methods the union chose are not immune from antitrust sanctions simply because the goal is legal. Here Local 100, by agreement with several contractors, made nonunion subcontractors ineligible to compete for a portion of the available work. This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.
 
 
 17
 421 U.S. at 625, 95 S.Ct. at 1836 (footnote omitted).
 
 
 18
 We understand Connell to hold, then, that an agreement between a union and a business organization, outside a collective bargaining relationship, which imposes a direct restraint upon a business market, and which is not justified by congressional labor policy because it has actual or potential anticompetitive effects that would not flow naturally from the elimination of competition over wages and working conditions, is not exempt from antitrust scrutiny.
 
 
 19
 On the record before us a jury could have found such an agreement. Like Connell Construction, Silver's purchases the services of building contractors. Like Connell, it has no collective bargaining relationship, actual or potential, with the Councils or their member locals. As in Connell, the jury could have found that the defendants entered into an agreement not to deal with nonunion contractors, which operated as a direct restraint on the business market by making those contractors "ineligible to compete for a portion of the available work." 421 U.S. at 625, 95 S.Ct. at 1836. The plaintiff introduced evidence that this agreement had "substantial (actual) anticompetitive effects" an increase of more than $250,000 in the total price paid for the twelve restaurants built by union contractors. Finally, the jury could have found that the agreement between Silver's and the Councils had "a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions." 421 U.S. at 635, 95 S.Ct. at 1841. For, on plaintiff's evidence, that agreement "indiscriminately excluded nonunion (contractors) from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods." 421 U.S. at 623, 95 S.Ct. at 1835. We therefore conclude that the grant of a directed verdict cannot be affirmed on the theory that any agreement which might be found is as a matter of law within the nonstatutory labor exemption.
 
 
 20
 The Connell defendants also argued that the agreement challenged there was expressly authorized by the construction industry proviso to § 8(e) of the Labor Act, and therefore exempt from antitrust scrutiny. In answer to this argument the Court held that the construction industry proviso was not intended to authorize subcontracting agreements that are neither within the context of a collective bargaining relationship nor limited to a particular job site. To appreciate that holding one must start with the 1959 amendment to the Labor-Management Relations Act, which provides:
 
 
 21
 (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any Contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void . . . .
 
 
 22
 29 U.S.C. § 158(e) (emphasis added). At the same time, recognizing the special historical situation in the construction and apparel industries, Congress added provisos to the general prohibition in section 8(e) creating limited exceptions for those two industries. The construction industry proviso reads:
 
 
 23
 (N)othing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.
 
 
 24
 29 U.S.C. § 158(e). In rejecting the proviso's application to the Local 100-Connell agreement Justice Powell wrote:
 
 
 25
 (The) careful limits (in § 8(b)(4) and § 8(e)) on the economic pressure unions may use in aid of their organizational campaigns would be undermined seriously if the proviso to § 8(e) were construed to allow unions to seek subcontracting agreements, at large, from any general contractor vulnerable to picketing. Absent a clear indication that Congress intended to leave such a glaring loophole in its restrictions on "top-down" organizing, we are unwilling to read the construction-industry proviso as broadly as Local 100 suggests. Instead, we think its authorization extends only to agreements in the context of collective-bargaining relationships and, in light of congressional references to the Denver Building Trades problem, possibly to common-situs relationships on particular jobsites as well.
 
 
 26
 421 U.S. at 633, 95 S.Ct. at 1840 (footnotes omitted).
 
 
 27
 Absent the construction industry proviso, the "express or implied" agreement which the jury could have found between Silver's and the Councils would clearly fall within the prohibitions of § 8(e), since it required Silver's "to cease doing business" with Muko and all other nonunion contractors. And Connell is controlling on the question whether that agreement was protected by the construction industry proviso, for here there is neither a collective bargaining relationship with Silver's nor any evidence of a common-situs problem. Thus the grant of a directed verdict cannot be affirmed on the theory that any agreement which might be found is protected by the construction industry proviso to § 8(e).[1] This conclusion renders legally irrelevant the fact, relied upon by the dissent, that the agreement here was entered into as a result of handbilling protected by the first amendment and the publicity proviso to § 8(b)(4) of the Labor Act. The protections of the publicity proviso evidently extend only to handbilling conducted in conformity therewith. Nothing in § 8(b)(4) can reasonably be construed to authorize an agreement between a union and an employer that falls within the wholly independent prohibition of § 8(e) of the Act. Nor has the first amendment been viewed as compelling protection for an agreement illegal under § 8(e) or the Sherman Act solely because that agreement was entered into as a result of protected speech.
 
 
 28
 While Connell was decided on the basis of a full trial record, we have not yet heard the defendants' evidence in this case. Our holding that the grant of a directed verdict cannot be sustained on the basis of the nonstatutory exemption therefore should not be misconstrued as a holding that the defendants cannot establish in the court below that they are entitled to that defense. We hold only that Muko has introduced evidence sufficient to entitle it to have a jury determine that issue. Nor do we decide the question whether a finding that an agreement made outside the collective bargaining context violates § 8(e) by itself removes labor's nonstatutory antitrust exemption. Cf. Consolidated Express v. New York Shipping Ass'n, Inc., supra. The fact that in Connell Justice Powell considered the actual and potential anticompetitive effects of the agreement independently of the § 8(e) issue suggests that the presence of a § 8(e) violation may not itself decide the exemption issue. In this case, however, as in Connell, there is evidence tending to show both a market restraint unjustified by the congressional interest in the elimination of competition over wages and working conditions and a violation of § 8(e). We therefore need not and do not rule on the effect of a § 8(e) violation standing alone.
 
 IV.
 
 29
 Silver's and the Councils urge that even if the labor exemption is inapplicable they were nevertheless entitled to a directed verdict on antitrust grounds. Their principal argument is that there was only a unilateral management decision resulting from unilateral union activity. We have rejected that argument in Part II above. A factfinder could have found an agreement to exclude nonunion contractors from the Silver's construction market, a significant interstate market consisting of twelve construction projects. The premise of both the majority and minority opinions in Connell is that absent an exemption such an agreement may be the basis of a federal antitrust claim. The jury might have found a concerted refusal to deal with a class of contractors of which Muko is a member. But whether the evidence here is viewed as capable of sustaining a finding of a group boycott, to which a Per se rule would apply, or some lesser restraint to which a rule of reason analysis might apply, it was sufficient to take Muko's case to the jury. We have no occasion on this record to rule on whether, after hearing the defendants' evidence as well, the court should instruct the jury that it should measure the agreement by rule of reason or Per se standards.[2]
 
 
 30
 The Councils also urge, though not enthusiastically, that Muko made an insufficient showing of injury to business or property within the meaning of § 4 of the Clayton Act. Insofar as that contention rests upon the lack of evidence from which the jury could have found lost business and lost profits we reject it on the basis of the record evidence referred to in Part I above. Insofar as it rests upon the suggestion that the stockholders of Muko (Muko's beneficial ownership is not a matter of record) could have gone "double breasted" by forming a separate corporation and signing union contracts with Council members we reject it for two reasons. First, the plaintiff is a business corporation, and it, not its stockholders, suffered the injury to business and property to which § 4 refers. Second, neither Muko nor any other employer may lawfully coerce its employees into a collective bargaining relationship, even for the purpose of avoiding economic injury. 29 U.S.C. § 158(a)(1).
 
 V.
 
 31
 The order granting a directed verdict will be reversed and the case remanded for a new trial.
 
 
 32
 ADAMS, Circuit Judge, concurring.
 
 
 33
 Were we in a position to decide this case on a clean slate, I would probably be inclined to hold that the union activity complained of here is not within the purview of the antitrust statutes but is instead solely a matter for scrutiny under labor law. I would subscribe to the view that unions ought to be subject to antitrust liability only when they combine with non-labor forces for the purpose of assisting those forces in suppressing commercial competition and in monopolizing the marketing of goods and services. When, however, unions are essentially pursuing traditional labor objectives, such as organizing employees or seeking to obtain higher wages and better working conditions for their members, it would appear logical to me that resort should be had primarily to labor law concepts to circumscribe the permissible scope of their conduct and to penalize them for their excesses.
 
 
 34
 Such an approach, it may be argued with a measure of assurance, would not appear to conflict with congressional intent inasmuch as Congress has on a number of occasions enacted legislation in order to remove certain labor activity from the ambit of the antitrust laws.[1] And, at one time it could plausibly have been submitted that the extent of the incursion by the antitrust laws into the labor law domain was indeed to be found somewhere along the foregoing line of demarcation.[2]
 
 
 35
 But whatever the merits of such an approach, the Supreme Court has rather clearly chosen to allow greater sway to the antitrust laws in the labor field. As the majority opinion points out, under the most recent Supreme Court pronouncement in Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), it is immaterial for purposes of determining whether labor-related activity is exempt from possible antitrust scrutiny that the union has as its goal legitimate and legal objectives: "(T)he methods the union chose are not immune from antitrust sanctions simply because the goal is legal."[3] So long as there is a "direct restraint on the business market" having "substantial anticompetitive effects, both actual and potential, that would not flow naturally from the elimination of competition over wages and working conditions," Connell teaches, the union's activity "contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws."[4] Given this explicit ruling by the Supreme Court, which I believe the majority has demonstrated is controlling as applied to the evidence introduced by the plaintiff in this case,[5] I am constrained to join in the majority's opinion.
 
 
 36
 ALDISERT, Circuit Judge, dissenting.
 
 
 37
 Our late colleague Abraham Freedman was fond of saying at decision conferences, "The way you come out in this case depends on how you go in." Judge Freedman was expressing in a few words one of the most important aspects of the judicial process that in judicial decision making, value judgments inhere in the choosing of the controlling legal precept.
 
 
 38
 The majority has made a value judgment. They have decided that when a labor union is involved in litigation with a business firm other than one with which it has a collective bargaining agreement, the court is required to take as a starting point the body of antitrust laws. They ask whether the alleged agreement here was exempt from antitrust scrutiny or lawful under antitrust law, but do not ask what I perceive to be the real issue does antitrust law apply to these facts at all, and if so, why. From the majority's initial premise, it follows that organized labor's activity is generally proscribed by antitrust laws unless labor can convince the court that its activity falls within some narrow exception to those laws. All labor exemptions rest on the meaning and interaction of the antitrust and the labor statutes. But these exceptions, which have been given the patronizing labels, "statutory" and "non-statutory" exemptions, have been carved out, not by Congress, but by the federal courts.
 
 
 39
 One who agrees with the majority's value judgment, and the political, sociological, and economic philosophies which influence it, will not fault the result it commands. But I disagree with their fundamental legal and philosophical premises. While I admit that their view is supported by a respectable body of federal decisions, I argue for a different set of fundamental values, values less antagonistic to the rights of organized labor and more reflective of the national labor policy judgments made by Congress.
 
 
 40
 I have a second disagreement with the majority which is more prosaic I do not share their unabashed infatuation with the decision in Connell Construction Co. v. Plumbers & Steamfitters Local No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). As a member of an inferior court in the federal judicial hierarchy, I must respect the precedential value of Connell. But I detect from it no inspirational philosophy or policy statements which persuade me to extend its holding, certainly not to the dissimilar, material facts of this case.
 
 I.
 
 41
 My starting point is a recognition that both the labor and the antitrust laws embody equally important congressional declarations of public policy. Unlike the majority, I do not think that either policy has a preferred status over the other. They must be viewed, in Justice Frankfurter's felicitous expression, "as a harmonizing text."[1] "On the one hand, the national labor policy favors collective bargaining as a means for promoting labor relation peace through equalization of the bargaining power in the labor market. On the other hand, the national antitrust policy favors competition in the market place as a means of protecting consumers from the evils of monopoly power and restraints of trade. The conflict created by these policies is apparent. To achieve their fundamental goals, unions, by their very nature as combinations of employees, must eliminate competition in the labor market by monopolizing the supply of labor. Powerful unions also have the potential for imposing restraints on competition in the market place, for example, by affecting the cost of labor and by limiting the use of new and more efficient methods of production."[2] In order to harmonize these apparently divergent policies, and because of the legislatively enacted national labor policy, I think it proper to presume that labor activity does not come within the purview of the antitrust laws unless it is Clearly not conduct for which the labor laws provide penalties and sanctions.
 
 
 42
 Milton Handler has observed in a discussion of Connell, United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), that these cases present a paradox:
 
 
 43
 How can we justify requiring certain conduct under the labor laws and at the same time subject that conduct to the panoply of sanctions imposed by the antitrust laws? And if union activities are forbidden as unfair labor practices under the labor laws, punishable by the recovery of single damages, why add criminal and treble damage exposure under the antitrust laws? Doesn't antitrust have enough to do without this unwelcome intrusion into the area of mandatory bargaining and unfair labor practices?[3]
 
 
 44
 I share Handler's concern; I have a fear that federal judges who do not share the political, sociological, and economic viewpoints that underlie the national labor policy are inclined to have that separately enacted congressional policy swallowed by our antitrust laws. Although invested with much power, federal judges must guard against using it improperly to impose their personal views when those views vary directly with policy pronouncements of the legislative branch. John Chipman Gray set forth the proper hierarchy when he wrote:
 
 
 45
 The State requires that the acts of the legislative organ shall bind the courts, and so far as they go, shall be paramount to all other sources. This may be said to be a necessary consequence from the very conception of an organized community.[4]
 
 
 46
 Many courts are ignoring the lessons of history. In the past, Congress has twice resorted to specific legislation to counteract federal court decisions holding labor activity within the prohibitions of the antitrust laws. First the Clayton Act of 1914 was passed in response to criticism of judicial decisions applying Sherman Act sanctions to trade union activities.[5] As explained in United States v. Hutcheson, 312 U.S. 219, at 229-30, 61 S.Ct. 463, at 465, 85 L.Ed. 788 (1941), § 20 of the Clayton Act "withdrew from the general interdict of the Sherman Law specifically enumerated practices of labor unions by prohibiting injunctions against them since the use of the injunction had been the major source of dissatisfaction and also relieved such practices of all illegal taint by the catch-all provision, 'nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States.' " In addition, § 6 of the Act provides:
 
 
 47
 The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; Nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.
 
 
 48
 15 U.S.C. § 17 (my emphasis).
 
 
 49
 The Clayton Act itself, however, engendered further controversy and legislation. As stated by the Hutcheson Court:
 
 
 50
 It was widely believed that into the Clayton Act courts read the very beliefs which that Act was designed to remove. Specifically, the courts restricted the scope of § 20 to trade union activities directed against an employer by his own employees. Duplex Co. v. Deering, (254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921)). Such a view it was urged, both by powerful judicial dissents and informed lay opinion, misconceived the area of economic conflict that had best be left to economic forces and the pressure of public opinion and not subjected to the judgment of courts. Ibid., pp. 485-486. Agitation again led to legislation and in 1932 Congress wrote the Norris-LaGuardia Act. Act of March 23, 1932, 47 Stat. 70, 29 U.S.C. §§ 101-115.
 
 
 51
 The Norris-LaGuardia Act removed the fetters upon trade union activities, which according to judicial construction § 20 of the Clayton Act had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes. More especially, the Act explicitly formulated the "public policy of the United States" in regard to the industrial conflict, and by its light established that the allowable area of union activity was not to be restricted, as it had been in the Duplex case, to an immediate employer-employee relation.
 
 
 52
 312 U.S. at 230-31, 61 S.Ct. at 465-66.
 
 
 53
 The lesson of this history is that the courts should stop presuming that labor's activities come within the framework of the antitrust laws. The proper approach, as I see it, is to accommodate a number of statutes: the Sherman Act, the Clayton Act, the Norris-LaGuardia Act, and also the public policy pronouncements of the National Labor Relations Act.II.
 
 
 54
 The orthodox accommodation of the national labor policy with antitrust law was first recognized in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), where the Supreme Court held that labor could claim no immunity from antitrust laws if it collaborated with management to suppress commercial competition in the industrial market. This was eminently sensible and was recently reaffirmed by this court to prohibit labor unions from joining businessmen in a blatant restraint of trade when the prime objective of the trade restraint was not the legitimate subject of union organizational activity. United States Steel Co. v. Fraternal Association of Steelhaulers, 601 F.2d 1269 (3d Cir. 1979).
 
 
 55
 Justice Stone, writing for the Court in Apex Hosiery, emphasized that the Sherman Act was not intended to cover any activity by a labor organization, or anyone else, unless that activity had, or was intended to have, a substantial effect upon commercial competition. This he termed the Sine qua non of antitrust liability. Justice Stone then specifically determined that the antitrust laws would be inapplicable, even were commercial competition adversely affected, if the challenged restraint resulted from the elimination of differences in labor standards or were a by-product of union activity regarding wages, hours and conditions of employment. He said:
 
 
 56
 A combination of employees necessarily restrains competition among themselves in the sale of their services to the employer; yet such a combination was not considered an illegal restraint of trade at common law when the Sherman Act was adopted, either because it was not thought to be unreasonable or because it was not deemed a "restraint of trade." Since the enactment of the declaration in § 6 of the Clayton Act . . . it would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act.
 
 
 57
 . . . (S)uccessful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods, . . . an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.
 
 
 58
 310 U.S. at 502-04, 60 S.Ct. at 997 (footnotes omitted).
 
 
 59
 Justice Stone's analysis is generally considered the centerpiece of what has developed into the non-statutory exemption carved out by the courts to uphold joint activity of labor and nonlabor parties when considerations of labor policy outweigh those of the antitrust policy. In Hutcheson, supra, and in Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), this notion was refined to provide that labor organizations would lose their immunity when the union activity was designed to "aid nonlabor groups to create business monopolies and to control the marketing of goods and services." Allen Bradley, supra, 325 U.S. at 808, 65 S.Ct. at 1539.
 
 
 60
 Further development occurred in Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), where, although no single opinion of the court emerged, at least six justices would have tested the legality of the activity in terms of the union's objective. When the union sought better wages, hours or working conditions, I. e., legitimate subjects of collective bargaining, its actions were protected by antitrust immuni ty. When what was sought by the union would constitute a forbidden restraint on the product market, however, there could be no immunity. In a critical passage of Jewel Tea, Justice White, writing for himself, Chief Justice Warren and Justice Brennan, stated that exemption from Sherman Act coverage depends in large measure on the extent to which the activity or agreement is "intimately related to wages, hours and working conditions" and obtained "through bona fide, arm's-length bargaining in pursuit of (the union's) own labor . . . policies, and not at the behest of or in combination with nonlabor groups . . . ." 381 U.S. at 689-90, 85 S.Ct. at 1602 (opinion of White, J., announcing the judgment of the Court). Three justices who did not join in Justice White's plurality opinion, but concurred in the result, would have gone further. Justices Goldberg, Harlan, and Stewart believed that agreements dealing with mandatory subjects of bargaining are wholly outside the antitrust laws. Id. at 697-735, 85 S.Ct. 1596.
 
 
 61
 Justice White's Jewel Tea formulation is extremely important because, in 1975, he was to join in the opinion of the Court in Connell. Summarizing the aforementioned precepts and agreeing with their application to the facts in that case, the Connell majority stated:
 
 
 62
 The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. See Mine Workers v. Pennington, supra, 381 U.S. at 666, 85 S.Ct. 1591; Jewel Tea, supra, 381 U.S. at 692-693, 85 S.Ct. 1603-04 (opinion of White, J.). Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, E. g., Federation of Musicians v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market.
 
 
 63
 421 U.S. at 622-23, 95 S.Ct. at 1835.
 
 III.
 
 64
 The critical factors which emerge from this analysis are the characterization and evidence of the challenged restraint. It becomes apparent that in accommodating the tension between the nation's antitrust and labor policies, the line must be drawn by identifying labor's specific objective and methods. If union efforts and methods are directed solely at raising labor standards by increasing wages, regulating hours and improving working conditions, the union's activities, although conducive to lessening competition, are nonetheless exempt from the proscriptions of the antitrust laws. When the activity goes beyond this purpose, it risks losing the protection afforded by the federal labor policy. A "direct restraint on the business market," one whose "substantial anticompetitive effects, both actual and potential . . . would not follow naturally from the elimination of competition over wages and working conditions," will not be protected by the exemption. Connell, supra, 421 U.S. at 625, 95 S.Ct. at 1836.
 
 
 65
 But having indicated how the line is to be drawn is not to say that judicial precedents fashion an easy test to determine exactly where the axe must fall.[6] Any test used to make that decision must include a presumption that antitrust law will not normally apply to union activity and that the union is not to be saddled with the burden of proving its activity is exempt. Rather, the burden of proving Non-applicability of the exemption should fall on the party alleging restraint.
 
 
 66
 By virtue of the sophistication of our national labor policy, See, e. g., Republic Steel Corp. v. UMW, 570 F.2d 467 (3d Cir. 1978); United Steelworkers v. NLRB, 530 F.2d 266 (3d Cir. 1976), labor enjoys a wide body of statutory protection. To say that its activities are not protected one should have to prove that labor has forfeited the rights guaranteed it and that it is somehow no longer entitled to rely on the crisp and clear edict of the Clayton Act, I. e., "nor shall (labor) organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws." 15 U.S.C. § 17. It is meaningless, therefore, to demonstrate only that union activity inhibits competition in the antitrust sense because, as stated by Dean St. Antoine, "the difficulty in applying the antitrust concept to organized labor has been that the two are intrinsically incompatable. The antitrust laws are designed to promote competition, and unions, avowedly and unabashedly, are designed to limit it."[7] In this regard, Professor Archibald Cox has written:
 
 
 67
 The purpose and effect of every labor organization is to eliminate competition in the labor market, Chief Justice Taft's classic statement observed:
 
 
 68
 "(Labor unions) were organized out of the necessity of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers an opportunity to deal in equality with their employer."
 
 
 69
 Each bricklayer's local seeks to control the supply of bricklayers' services available to contractors within its geographical jurisdiction. United Steelworkers of America controls the supply of labor available to United States Steel Corporation. In this sense every union is an avowed monopolist.
 
 
 70
 Cox, Labor and the Antitrust Laws A Preliminary Analysis, 104 U.Pa.L.Rev. 252, 254 (1955) (footnote omitted).
 
 
 71
 The doctrine of Stare decisis requires inferior courts in the judicial hierarchy to be bound by the determinations of superior courts. Were I writing a majority opinion I would probably be restrained from voicing these independent observations. But a separate opinion is a legitimate medium through which opposing views may be advanced to encourage open and robust debate. If our tradition did not provide for the vehicle of the separate opinion but permitted only rote obeisance to decided cases, the law would be embalmed, unreceptive to reexamination, incapable of adjustment to experience or change. Were I permitted to escape from the judicial hierarchy, intellectual integrity would compel my criticism of past judicial usurpation of the congressional mandate in cases similar to this one. I would observe that "(t)he historian must take the long view of the matter" and note that by action of the federal courts "an anti-trust act was converted into an anti-union act,"[8] that "(l)aws . . . on unionization and other reform legislation of a kind that had been enacted in European countries a generation before were delayed ten to twenty-five years by the High Court."[9]IV.
 
 
 72
 While being critical of the judicial abrogation of the national labor policy, I think that, consistent with the doctrine of Stare decisis, one can concede a precedential or institutional value of Connell and still legitimately argue that the rule announced there does not command a similar result in this case. In the view I take, Connell is not an example of a principled decision suggesting a desirable development of the law. It is not a case which should be used to spawn a large progeny. Rather, it states a rule which should be limited to its facts.
 
 A.
 
 73
 A recent publication by the American Law Institute-American Bar Association Committee on Continuing Professional Education expresses a similar view.
 
 
 74
 In evaluating Connell's new consensus, the result reached by the majority can be viewed as another Sui generis response to a particular problem in a specific industry rather than the exposition of a governing principle that might guide lower courts and litigants in future cases.
 
 
 75
 F. Bartosic & R. Hartley, Labor Relations Law in the Private Sector 190 (1977).
 
 
 76
 Likewise, Connell has met with strong criticism from other commentators. Consider Dean St. Antoine's pointed remarks:
 
 
 77
 The Connell majority erred in failing to realize that under established precedents, the antitrust laws exempt agreements, whether primary or secondary, that are aimed at promoting union organization, as well as agreements that are aimed at eliminating competition over labor standards. The principal qualification, as Allen Bradley suggests, is that the restriction must not be broader than the objective requires. Perhaps Justice Powell had something like this in mind when he commented in Connell that the challenged agreements "did not simply prohibit subcontracting to any nonunion firm; they prohibited subcontracting to any firm that did not have a contract with Local 100." But in the parlance of the building trades, a "nonunion" firm in the jurisdiction of Local 100 would have meant any employer not having a contract with Local 100. Certainly there is nothing in the record to indicate that Local 100 was seeking to use the subcontracting clause to establish the sort of "geographical enclave" involved in Allen Bradley. Thus, without ever undertaking the critical inquiry into the extent to which the subcontracting agreement was related to union organizational objectives, the Connell majority arrived at the conclusion that the union had lost its antitrust immunity.
 
 
 78
 The most egregious failure of the Connell majority to take proper account of the policies of the labor laws in working out an accommodation with the antitrust laws came last, and Justice Stewart made it the principal focus of his dissent. As he pointed out, Local 100's secondary activity at the Connell site was subject to comprehensive regulation under Sections 8(b)(4) and 8(e) of the NLRA and Section 303 of the Labor Management Relations Act (LMRA). Congress, in his view, meant to impose carefully defined sanctions for union secondary violations, and in so doing, meant to exclude private antitrust suits as a remedy.
 
 
 79
 St. Antoine, Supra note 7, at 622, 626 (footnotes omitted).
 
 
 80
 In his annual survey of antitrust cases Milton Handler suggests that Connell (along with the Pennington and Jewel Tea decisions) amounts to an improper application of antitrust law:
 
 
 81
 (W)e now have the uncertainties of what conduct is intimately related to wages, hours and conditions of employment, which mandatory subjects are and which are not exempt, and finally which unfair labor practices are within antitrust's coverage and which are not. Frankly, whatever may have been the deficiencies of the pre-Pennington labor-antitrust tenets, I cannot perceive how these post-Pennington changes provide any improvement. I do perceive how they compound the confusions and uncertainties with which this murky field abounds, I thus adhere to my frequently expressed view that antitrust is a singularly inappropriate weapon to curb labor union abuses and that such abuses should be prohibited by specific labor legislation with specific and exclusive remedies.
 
 
 82
 Handler, Supra note 3, at 1025 (footnotes omitted).
 
 
 83
 Professor Monaghan is also of the view that Connell was incorrectly decided and that the Court's interpretation limiting the § 8(e) proviso to agreements within a collective bargaining context was unresponsive to the congressional purpose behind the proviso.
 
 
 84
 (T)he Court's results, both on the antitrust and section 8(e) issues, appear incorrect. Unlike the restrictions found to violate the Sherman Act in Allen Bradley, Local 100's agreement seems fully related to the union's organizing campaign. Obviously, the exclusion of nonunion subcontractors from the Dallas area was crucial to the Local's success. As the Court suggested, however, the subcontracting agreement might also prevent subcontractors outside the union's geographical jurisdiction from working in the Dallas area. But the union could not succeed in organizing plumbers in Dallas if general contractors remained free to import nonunion subcontractors. Similarly, once an outside subcontractor performs work within the union's jurisdiction, the Local may have a labor dispute with it over union recognition. Since general contractors dealing with such subcontractors would be allies of an employer with whom the union has a dispute, an agreement preventing such subcontracting should be within the construction industry proviso of section 8(e).
 
 
 85
 Monaghan, The Supreme Court, 1974 Term, 89 Harv.L.Rev. 1, 244-45 (1975) (footnotes omitted).
 
 
 86
 Professors Areeda and Turner in their treatise on antitrust also question the desirability of the Connell rule. See 1 P. Areeda & D. Turner, Antitrust Law 218-22 (1978). See also Christensen, The Supreme Court's Labor Law Decisions, October 1974 Term Past, Prologue, and the Potomac Parallax, in Labor Law Developments 1976, 33 (1976).
 
 B.
 
 87
 Assuming as we must, however, the viability of Connell as the Supreme Court's most recent pronouncement in this area, a comparison of its facts is particularly useful in weighing the competing labor and antitrust considerations presented in this appeal. A five-four decision, Connell involved a factual complex held not to fit within the labor exemption to the antitrust laws.
 
 
 88
 Local 100, a bargaining representative for workers in the plumbing and mechanical trades, approached Connell, a general contracting firm, and demanded that it sign an agreement to award subcontracts only to firms that had "an executed, current collective bargaining agreement with Local 100 . . . ." 421 U.S. at 619-20, 95 S.Ct. at 1834. This was part of a larger union campaign to obtain identical agreements with general contractors throughout Dallas.[10] When Connell refused to sign an agreement, the union posted a picket at one of its major construction sites, and 150 workers walked off the job, bringing construction to a halt. Connell subsequently signed the agreement under protest and sued, claiming the agreement violated the Sherman Act and was therefore invalid.
 
 
 89
 The Supreme Court did not find the agreement to be violative of the Sherman Act but remanded the proceedings for a new trial on the issue, after determining that the circumstances evidenced the kind of "direct restraint on the business market" which could not claim exemption from the antitrust laws, 421 U.S. at 625, 95 S.Ct. at 1836. This conclusion was compelled by the presence of three factors. First, the agreement indiscriminately forbade the hiring of nonunion subcontracting firms, even if a firm's competitive advantage resulted from efficiency and not from substandard wages or working conditions. Second, only those subcontractors who were parties to current contracts with Local 100 could be hired, an arrangement allowing the union to manipulate the subcontractor market by agreeing or refusing to contract with any firm it might choose. Third, the union was party to a multiemployer bargaining agreement that contained a most-favored nation clause which in effect sheltered association subcontractors against competition from outside subcontractors in that part of the market covered by subcontract agreements between general contractors and Local 100.
 
 C.
 
 90
 The facts of the present appeal differ materially from those in Connell. Arguably, Connell's first element is present an "agreement" that commits Long John Silver's to hiring union craftsmen, and not hiring even an efficient nonunion contractor. Yet I am not persuaded that appellant introduced enough evidence to prove the second element. Long John Silver's letter to the unions indicates an intent to use only contractors "certified" by the unions; Muko introduced no evidence to explain the significance of certification, or to show that the unions exercised the degree of market control that Local 100 sought in Connell. Moreover, the agreements in Connell "did not simply prohibit subcontracting to any nonunion firm; They prohibited subcontracting to any firm that did not have a contract with Local 100." 421 U.S. at 624, 95 S.Ct. at 1836 (my emphasis). No such comprehensive restraint was present here, nor could it be properly inferred. As for the third element, there is neither allegation nor evidence of a multiemployer agreement with a most-favored nation clause.
 
 
 91
 More important than point-by-point distinctions, however, is the fundamental difference between the methods employed to press the cause of labor by the appellees here and those employed by Local 100 in Connell. In Connell, Local 100 had launched an all-out campaign to obtain identical agreements with general contractors throughout Dallas. Contractors like Connell who refused to sign would be, and were, picketed until they did. The picketing at Connell's site closed it down.[11] In contrast, the record here discloses no such widespread, dominating union action. Picketing occurred at only one site, without causing a shutdown, and the handbilling which took place at the completed location lasted for only a week. The meeting between the unions and Long John Silver's occurred two months later. For all that appeared in appellant's case, the unions were concerned solely with persuading one firm in the entire Pittsburgh area to hire union craftsmen to build its restaurants. There is no evidence that the unions distributed handbills at any other establishment constructed by Muko, or at the premises of another company.[12] Nor is there evidence that Muko was picketed while it worked jobs for other employers. Thus this case presents a picture entirely different from Connell. This was an instance of union activity which was low-key and narrow in scope; an activity "intimately related to wages, hours and working conditions," normal aspirations of a union with a one-employer target; an activity unaccompanied by any effort to subject an entire industry to its demands and substantially restrain the products market.
 
 
 92
 Finally, I consider it especially significant that the alleged agreement in the present case, Long John Silver's letter to the unions, was a direct result of legitimate handbilling on the part of the unions. The peaceful distribution of handbills, within the permissible limits of § 7 of the National Labor Relations Act, 29 U.S.C. § 157, carries the protection of the first amendment.[13] Subject to certain reasonable restrictions not involved in these proceedings, See, e. g., Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), and subject also to unfair labor practice considerations set forth in 29 U.S.C. § 158(b)(1), union handbilling is a protected activity. E. g., Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); Texaco, Inc. v. NLRB, 462 F.2d 812 (3d Cir.), Cert. denied, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 302 (1972). Handbilling is also protected by the statutory publicity proviso of § 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4). E. g., Local No. 54, Sheet Metal Workers, AFL-CIO, 179 N.L.R.B. 362 (1979); Plumbers and Pipefitters Local No. 142, AFL-CIO, 133 N.L.R.B. 307 (1961). Paragraph (4) of § 8(b) prohibits certain forms of secondary boycotts, but the publicity proviso reads as follows:
 
 
 93
 Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.
 
 
 94
 The handbilling in this case was a form of publicity, carried on to inform the public of the labor dispute between the unions and Muko. Neither Muko nor Long John Silver's contends that the handbills were untruthful, or that the handbilling induced Long John Silver's employees not to perform their jobs.
 
 V.
 
 95
 Connell is but one Supreme Court decision, albeit the most recent, in this difficult area of the law. I make use of it in conjunction with previous applicable cases, while the majority gives it a far broader, in my view an extravagant, interpretation that fails to account for other equally important Supreme Court pronouncements on this subject.
 
 
 96
 Federal courts make individual decisions when deciding the case or controversy before them. Individual decisions give way to "rules" which, in Roscoe Pound's formulation, are "precepts attaching a definite detailed legal consequence to a definite, detailed set of facts." Pound, Hierarchy of Sources and Forms in Different Systems of Law, 7 Tul.L.Rev. 475, 482 (1933). The essence of law as an ongoing process requires that we look not to One "rule" alone and "colormatch" it with the case at hand, but that we see the rule of a case as a single fiber in the pattern of rules created by previous holdings. The fabric of the law cannot depend for its strength on any one thread but must be woven with the woof and warp of many cases. Therefore, I refuse to make of Connell a whole cloth, let alone the coat of many colors envisioned by my brothers. I view Connell with other Supreme Court cases as, for example, Jewel Tea, supra, noting the precise extent of Justice White's participation in both. I simply cannot agree with the majority's characterization of Connell as a piece of judicial legislation which virtually destroys labor's exemption from the antitrust laws "outside a collective bargaining relationship." Maj. op. at 1373.VI.
 
 
 97
 Giving full consideration to both the antitrust and the national labor policies, I would hold, as a matter of law, that appellant did not make out a prima facie case that would bring the alleged restraint within the bar of the antitrust laws. I would affirm the judgment of the district court.
 
 
 
 [1]
 Chief Judge Seitz is of the view that the question whether the defendants' agreement is violative of § 8(e) of the NLRA is not presented as a "collateral issue" in this antitrust action, and need not be decided. See Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 626, 95 S.Ct. 1830, 1837, 44 L.Ed.2d 418 (1975). He notes that the defendants here have not argued, as did the defendants in Connell, that their agreement was "explicitly allowed by the construction-industry proviso to § 8(e) and that antitrust policy therefore must defer to the NLRA." Id. Moreover, he believes that we should not convey the impression to the district courts that an appropriate short-hand method of deciding the applicability of the non-statutory exemption in cases such as this is to determine whether the challenged agreement constitutes an unfair labor practice; such a method would lead to the needless resolution by the federal courts of significant labor law questions that ought to be decided in the first instance by the NLRB. Cf. Consolidated Express, Inc. v. New York Shipping Ass'n, Inc., 602 F.2d 494 (3d Cir., 1979) (effect of prior NLRB determination that an agreement is violative of § 8(e))
 
 
 [2]
 Because of the dispute's labor context, Judge Weis is of the view that the activity here should not be construed as a conventional group boycott to which the Per se rule would apply. He would use the rule of reason standard. See Consolidated Express, Inc. v. New York Shipping Ass'n, Inc., 494 F.2d 602 (3d Cir. 1979) (Weis, J., Concurring and dissenting )
 
 
 [1]
 Thus, for example, as the dissent in greater detail, portions of the Clayton Act were enacted in 1914 for the purpose of inhibiting federal courts from using the Sherman Act in order to curtail labor activity. In § 6 of the Clayton Act, 15 U.S.C. § 17, unions were declared not to be illegal combinations, and labor was pronounced not to be a commodity or article of commerce. Also, § 20 of the Act, 29 U.S.C. § 52, proscribed the issuance of injunctions against specifically enumerated practices of labor unions and removed any taint of illegality from those practices. And the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, promulgated in 1932, further narrowed the circumstances under which the antitrust laws may be brought to bear against labor unions. See generally United States v. Hutcheson, 312 U.S. 219, 229-31, 61 S.Ct. 463, 85 L.Ed. 788 (1941)
 
 
 [2]
 See Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); United States v. Hutcheson, supra; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940)
 
 
 [3]
 Connell, supra, 421 U.S. at 625, 95 S.Ct. at 1836
 
 
 [4]
 Id
 
 
 [5]
 Because the plaintiff appeals from the grant of defendants' motions for a directed verdict, entered at the end of plaintiff's case, it is entitled to a reversal if sufficient evidence exists to support a jury finding in its favor. See, e. g., Firemen's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1177 (3 Cir. 1976), Cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977)
 
 
 [1]
 United States v. Hutcheson, 312 U.S. 219, 231, 61 S.Ct. 463, 85 L.Ed. 788 (1941)
 
 
 [2]
 F. Bartosic & R. Hartley, Labor Relations Law in the Private Sector 183 (ALI-ABA 1977)
 
 
 [3]
 Handler, Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term 1977, 77 Colum.L.Rev. 979, 1022 (1977)
 
 
 [4]
 J. C. Gray, The Nature and Sources of the Law 124-25 (1921)
 
 
 [5]
 "This statute (the Clayton Act) was the fruit of unceasing agitation, which extended over more than twenty years and was designed to equalize before the law the position of workingmen and employer as industrial combatants." Duplex Printing Press Co. v. Deering, 254 U.S. 443, 484, 41 S.Ct. 172, 182-83, 65 L.Ed. 349 (1921) (Brandeis, J., dissenting)
 
 
 [6]
 Substantial uncertainty surrounds the boundary between the labor and the products markets as well as the appropriate method for accommodating the enforcement of the Sherman Act with the National Labor Relations Board's jurisdiction over the subject matter of collective bargaining. Meltzer, Labor Unions, Collective Bargaining, and the Antitrust Laws, 32 U.Chi.L.Rev. 659, 704 (1965)
 
 
 [7]
 St. Antoine, Connell: Antitrust Law at the Expense of Labor Law, 62 Va.L.Rev. 603, 604 (1976)
 
 
 [8]
 Levy, Judicial Review, History, and Democracy: An Introduction, in Judicial Review and the Supreme Court 36 (1967)
 
 
 [9]
 M. Parenti, Democracy for the Few 311 (1977)
 
 
 [10]
 By the time the case went to trial, Connell and five other general contractors had been induced to sign agreements, and the union was waging a selective picketing campaign against those who resisted. 421 U.S. at 621, 95 S.Ct. 1830
 
 
 [11]
 The majority in Connell declined to consider whether this picketing was lawful. 421 U.S. 637-38, n. 19, 95 S.Ct. 1830. But Justice Stewart's dissent argued convincingly that it could not be lawful under the majority's position. 421 U.S. at 648, 95 S.Ct. 1830
 
 
 [12]
 Although Muko's complaint alleges that appellee unions engaged in similar activities with respect to construction of other fast food restaurants, Amended Complaint at Par. 20, the contention has not been urged on appeal
 
 
 [13]
 Section 7, 29 U.S.C. § 157, provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.