670 F.2d 421
 109 L.R.R.M. (BNA) 2469, 93 Lab.Cas. P 13,224,
1982-1 Trade Cases 64,505
 LARRY V. MUKO, INC., Appellant in No. 81-1696,
v.
SOUTHWESTERN PENNSYLVANIA BUILDING AND CONSTRUCTION TRADES
COUNCIL and Long John Silver's, Inc., Building Council of
Pittsburgh, Pa. & Vicinity, Southwest Building Trades
Council and Pittsburgh Building Trades Council, Appellants
in No. 81-1697.
Long John Silver's, Inc., Appellant in No. 81-1698.
 Nos. 81-1696 to 81-1698.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 26, 1981.
Decided Jan. 25, 1982.
Rehearing and Rehearing In Banc Denied Feb. 17, 1982.
 
 Stanford A. Segal (argued), Gatz, Cohen, Segal & Koerner, Pittsburgh, Pa., for Southwest Bldg. Trades Council and Pittsburgh Bldg. Trades Council.
 Daniel I. Booker (argued), Ira S. Lefton, Reed Smith Shaw & McClay, Pittsburgh, Pa., for Long John Silvers, Inc.
 R. A. King (argued), Melvin L. Moser, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, P.C., Pittsburgh, Pa., for Larry V. Muko, Inc.
 Before ADAMS, VAN DUSEN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This is the second time this case has come before us. In Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council, 609 F.2d 1368 (3d Cir. 1979) (Muko I), this Court, sitting in banc, reversed a district court order granting defendant's motion for a directed verdict and remanded the case for a new trial. The second trial resulted in a jury verdict for the defendants, and the plaintiff once again has appealed to this Court. We affirm.
 
 I.
 
 2
 Long John Silver's, Inc. ("Silver's"), a Delaware corporation headquartered in Lexington, Kentucky, operates fast food seafood restaurants in several markets across the United States. In 1973, it decided to enter the Pittsburgh, Pennsylvania market, and contracted with Larry V. Muko, Inc. ("Muko"), a non-union general contractor experienced in constructing fast food restaurants, to build its first outlet in Monroeville, a suburb of Pittsburgh. After completion of the Monroeville restaurant, Silver's president Jim Patterson met with Larry Muko and indicated his willingness to give future construction business to Muko if his prices remained competitive and the quality of his construction remained good. Muko was awarded a contract to build a second restaurant in Lower Burrell, Pennsylvania, but Silver's did not commit itself any further.
 
 
 3
 During construction of the Monroeville restaurant, two labor organizations, the Southwestern Pennsylvania Building and Construction Trades Council and the Building and Construction Trades Council of Pittsburgh (the "Councils"), picketed the site. After completion of construction, handbills were distributed to customers of the Monroeville restaurant urging them not to patronize Silver's because the chain used "contractors who are paying less than the established prevailing wages in the area." Appendix at 115a. The handbill exhorted the customers "to protect the living and working standards established by the Building Trades Council." Id.
 
 
 4
 Silver's management was alarmed when it was informed that customers were leaving the premises after reading the handbill. In response to the leafletting, Silver's arranged a meeting with the Building Trades Councils. After the meeting, Silver's vice-president sent a letter to the Councils emphasizing the company's "desire to establish good working relationships with the unions in the Greater Pittsburgh Area" and stating Silver's "intent ... to use only union contractors certified by the (Councils)" in the future. The letter concluded: "In any relationship between two parties there must be mutual need and assistance.... It is ... extremely important to both parties that our location at Monroeville, Pennsylvania and the one under construction in Lower Burrell Township, Pennsylvania not be subjected to any kind of informational picketing." Appendix at 116a-117a.
 
 
 5
 Subsequently, Silver's employed only unionized general contractors to build its Pittsburgh-area restaurants, although the general contractors were free to use non-union subcontractors. Silver's discussed with Muko the question whether Muko would be willing to bid on the construction of its restaurants as a union firm. Muko declined to build under such circumstances, however, and it was not awarded any of Silver's contracts after the construction of the Lower Burrell restaurant.
 
 
 6
 On August 12, 1975, Muko filed the present lawsuit against Silver's and the two Councils, alleging that the defendants had entered into an agreement to award contracts for the construction of Silver's restaurants in the Pittsburgh area only to union contractors. This, claimed Muko, was an unreasonable restraint of trade in violation of section 1 of the Sherman Act and sections 4 and 16 of the Clayton Act. After Muko presented its case at a jury trial held on July 19-20, 1977, the district court granted the defendants' motion for a directed verdict. The directed verdict apparently was granted "because the court believed the evidence could sustain no finding other than a unilateral decision on the part of Silver's to accept bids only from union contractors." 609 F.2d at 1372. On appeal, this Court, sitting in banc, reversed and remanded the case for a new trial. 609 F.2d 1368. We held that the jury could have found an agreement between Silver's and the Councils that was not exempt from antitrust scrutiny because, under the standards set forth in Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), such an agreement might have "actual or potential anticompetitive effects that would not flow naturally from the elimination of competition over wages and working conditions." 609 F.2d at 1373.
 
 
 7
 Upon remand, a bifurcated jury trial on issues of liability and damages took place. At the close of the evidence on liability, the district court submitted four special interrogatories to the jury:
 
 
 8
 1. Did Long John Silver's and the Trade Councils enter into an agreement or combination to refuse to grant construction contracts to non-union builders, including Muko?
 
 
 9
 If your answer to question 1. is NO, go no further. If your answer to question 1. is YES, go on to question 2.
 
 
 10
 2. Was the effect of the agreement between Long John Silver's and the Trade Councils to impose a restraint on free competition beyond that which would follow from the elimination of competition based on wage rates and working conditions?
 
 
 11
 If your answer to question 2. is NO, go no further. If your answer to question 2. is YES, go on to question 3.
 
 
 12
 3. Was the agreement between Long John Silver's and the Trade Councils an unreasonable restraint of trade under the standards given you by the court in its instructions?
 
 
 13
 If your answer to question 3. is NO, go no further. If your answer to question 3. is YES, go on to question 4.
 
 
 14
 4. Did the agreement between Long John Silver's and the Trade Councils cause injury to the plaintiff in his business or property?
 
 
 15
 On February 17, 1981, the jury returned its verdict, answering "Yes" to Interrogatories 1 and 2 and "No" to Interrogatory 3. The jury thus found that the defendants had reached an agreement, outside the labor exemption, to exclude Muko as a competitor for Silver's construction work. Because the jury concluded that the agreement was not an unreasonable restraint of trade, however, the district court entered judgment for the defendants. The district court subsequently denied Muko's motion for a new trial and denied defendants' conditional motions for judgment n. o. v. This appeal followed.
 
 II.
 
 16
 Muko challenges two aspects of the district court proceeding. First, it claims that the trial judge erred as a matter of law when he instructed the jury to apply the rule of reason, rather than the per se standard, to the agreement at issue. Second, it argues that, even if the district judge was correct in applying the rule of reason, he erred in his instructions on the relevant product market. We disagree with both contentions.[1]
 
 III.
 A.
 
 17
 In the earlier in banc opinion in this case, we declined to decide the proper standard by which to measure any potential antitrust violation. We intimated, however, that traditional antitrust principles would govern such a determination by the district court:
 
 
 18
 The jury might have found a concerted refusal to deal with a class of contractors of which Muko is a member. But whether the evidence here is viewed as capable of sustaining a finding of a group boycott, to which a per se rule would apply, or some lesser restraint to which a rule of reason analysis might apply, it was sufficient to take Muko's case to the jury. We have no occasion on this record to rule on whether, after hearing the defendants' evidence as well, the court should instruct the jury that it should measure the agreement by rule of reason or per se standards.
 
 
 19
 609 F.2d at 1376 (footnote omitted).
 
 
 20
 In counseling that the level of antitrust inquiry depends upon the nature of the conduct alleged, even in the labor-antitrust context, Muko I reflected the approach taken by a panel of this Court in Consolidated Express, Inc. v. New York Shipping Association, 602 F.2d 494 (3d Cir. 1979), vacated and remanded on other grounds, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980) ("Conex "), a case decided several months prior to Muko I. There, the plaintiff was a freight consolidator whose business was threatened after defendants New York Shipping Association (an association of employers) and the longshoremen's union negotiated "Rules on Containers" and the so-called "Dublin Supplement" in response to the perceived threat to waterfront labor posed by technological change in the shipping industry. Conex claimed, inter alia, that the defendants' enforcement of the rules constituted a group boycott of the plaintiffs that was illegal per se under the Sherman Act.[2] We held, as an initial matter, "that the proper method of analysis is to determine the issue of nonstatutory labor exemption separately, ... and then to proceed with conventional antitrust scrutiny of the complaint." 602 F.2d at 522. In so holding, the Conex Court expressly rejected Professor Handler's view "that there be a full-scale rule of reason inquiry in every instance in which a non-exempt activity is claimed to be in violation of antitrust." Handler, Labor and Antitrust: A Bit of History, 40 Antitrust L.J. 233, 239-40 (1971). Pointing to United Mineworkers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and its companion case, Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), Judge Gibbons concluded: "(T)he three groups of Justices in those cases, while they diverged widely on other issues, appear to have agreed that 'settled antitrust principles' would be 'appropriate and applicable' to activity found to be nonexempt.... Those 'settled' principles include the per se rule, where the facts warrant its application." 602 F.2d at 522-23 (emphasis added).
 
 
 21
 We take this opportunity explicitly to reaffirm the holding in Conex, as reflected implicitly in Muko I. In so doing we adopt a middle position between that advocated by Professor Handler and that proposed by the appellant in the case at hand. While we agree with Professor Handler that the "factors to be considered in determining the existence of an antitrust exemption are separate and distinct from those bearing on the presence of an antitrust infraction," and that "once such conduct is deemed not exempt, it is incumbent upon the decisionmaker to consider the relative anticompetitiveness of the conduct before imposing antitrust liability," Handler & Zifchak, Collective Bargaining and the Antitrust Laws: The Emasculation of the Labor Exemption, 81 Colum.L.Rev. 459, 511 (1981), we do not share Professor Handler's view that union conduct necessarily "should be measured by the rule of reason in recognition of the peculiar labor relations context in which the restraint arises even if, in a nonlabor context, similar conduct might be per se unlawful." Id. at 510.[3] The mere fact that a labor union is one of the participants in an otherwise illegal combination should not preclude a determination that, in appropriate circumstances, the conduct is unreasonable per se. See, e.g., Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). The per se rule is, essentially, a short cut employed by a court in determining unreasonableness; as Professor Sullivan has taught, "the per se doctrine is precisely a special case of rule of reason analysis." L. Sullivan, Handbook of the Law of Antitrust (1977). See discussion in part III(B) infra. If, after extensive experience with a particular kind of union conduct, a court concludes that the conduct invariably restrains competition, it is unnecessary, in our view, for the court to engage in lengthy rule-of-reason analysis when the per se rule would yield identical results more efficiently and expeditiously.
 
 
 22
 It is important, however, to caution against mechanical or imprudent application of the per se rule in the labor context. A finding that particular union conduct has anticompetitive effects that do "not flow naturally from the elimination of competition over wages and working conditions," and hence is non-exempt under Connell, should not drive a court inexorably to the conclusion that the union has violated the antitrust laws. We thus cannot agree with Muko, who contends that every labor-antitrust case in which the labor exemption is found to be inapplicable should be held illegal under the per se standard.
 
 
 23
 In support of this proposition Muko points to the following language in the Conex opinion:
 
 
 24
 (O)nce a court has concluded that the labor exemption does not shield anticompetitive conduct, application of the rule of reason is redundant. The justification offered for application of the rule of reason is the need to recognize, in the antitrust context, labor's legitimate interest in the collective bargaining process. That interest, however, is precisely the same one that must be taken into account in determining the scope of the nonstatutory labor exemption. A holding that the exemption does not apply embodies a judgment that considerations of labor policy are outweighed by the anticompetitive dangers posed by the challenged restraint. The proposed use of the rule of reason would, therefore, simply be an invitation to the court or jury to reweigh under a different label the question of the non-statutory exemption.
 
 
 25
 602 F.2d at 523-24.
 
 
 26
 Although this language appears to support Muko's contention, the actual holding in Conex is far narrower in scope. In Conex, in fact, this Court carefully analyzed the conduct in question before determining that it constituted a per se illegal group boycott. See discussion in part III(B) infra. Indeed, the Court suggested that had procompetitive effects been shown, the boycott may have been removed from the category of per se violations. See 602 F.2d at 524 n.18 and accompanying text. As the Conex majority points out, "public interest" considerations, such as the advancement of labor policy, are not proper subjects for examination under the rule of reason. National Society of Professional Engineers v. United States, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978).[4] The passage from Conex quoted above merely reflects the view that it is unnecessary, if not improper, to weigh "labor's legitimate interest in the collective bargaining process" twice-once in determining the labor exemption and again in deciding the antitrust liability question. See Casey & Cozzillio, supra note 3, at 271. There is no indication that the Court was prepared to find that the defendants' conduct was per se illegal merely because it was not exempt from the antitrust laws.[5] Moreover, in Muko I, Judge Gibbons-who earlier had written Conex -explicitly left open the possibility that a "lesser restraint," though nonexempt, might be judged under the rule of reason. 609 F.2d at 1376. But see King & Moser, Muko and Conex: The Third Circuit Responds to Connell, 8 Pepperdine L.Rev. 79 (1980).
 
 
 27
 In short, a fair reading of both Conex and Muko I impels the conclusion that, once it is ascertained that union activity falls outside the protection of the labor exemption, a court must apply traditional antitrust principles in determining whether the activity in question violates the antitrust laws.[6] In most cases the rule of reason will supply the measure of illegality; the per se rule may, however, be invoked where appropriate. We turn now to this inquiry.
 
 B.
 
 28
 Though framed in absolute terms, section 1 of the Sherman Act[7] has been construed throughout its history to proscribe only unreasonable restraints of trade. Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In most cases, a "rule of reason" analysis requires a detailed examination of the affected business and the nature of the restraint imposed.[8] There are, however, "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such determinations of per se illegality are not casually made. As the Supreme Court noted in United States v. Topco Associates, 405 U.S. 596, 607-08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), and as our Court reiterated most recently in Tose v. First Pennsylvania Bank, 648 F.2d 879, 891 (3d Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), "(i)t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." See Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164, 166-67 (3d Cir. 1979); Harold Friedman Inc. v. Thorofare Markets Inc., 587 F.2d 127, 140 (3d Cir. 1978).[9] Neither mere speculation, nor the desire to simplify the cumbersome process of determining antitrust illegality, is enough to justify the imposition of a per se rule. In Tose, for example, we declined to extend the per se rule to an agreement to force a distress sale of a partner's share of a business because we were "not aware of any body of judicial experience teaching" that such an agreement had a " 'pernicious effect on competition ....' " 648 F.2d at 891. In short, "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58-59, 97 S.Ct. 2549, 2561-2562, 53 L.Ed.2d 568 (1977) (emphasis added).
 
 
 29
 Group boycotts have typically been among those categories of conduct deemed unreasonable per se. See, e.g., United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). In Klor's, supra, for example, the Supreme Court condemned as unlawful an agreement between a large chain department store and a group of manufacturers and distributors not to deal with a smaller, competing retail store. The Court declared:
 
 
 30
 Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they "fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality." Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 466, 467-468 (61 S.Ct. 703, 707, 708, 85 L.Ed. 949). Cf. United States v. Trenton Potteries Co., 273 U.S. 392 (47 S.Ct. 377, 71 L.Ed. 700). Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court said in Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 213 (71 S.Ct. 259, 260, 95 L.Ed. 219), "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Cf. United States v. Patten, 226 U.S. 525, 542, 33 S.Ct. 141, 145, 57 L.Ed. 333.
 
 
 31
 359 U.S. at 212, 79 S.Ct. at 709 (footnote omitted) (emphasis added).
 
 
 32
 Though Klor's appears flatly to proscribe group boycotts, whatever their form or function, courts and commentators[10] alike continue to resist the notion that all concerted refusals to deal fall automatically as per se violations of the antitrust laws. Generally, the application of the per se rule has been limited to those "classic" boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace.[11] "The crucial element" in such boycotts, according to Professor Sullivan, "is an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete. The classic boycott ... also usually entails an effort to induce two or more suppliers or customers not to deal with firms being excluded from the protected level." L. Sullivan, Handbook of the Law of Antitrust 260 (1977).
 
 
 33
 While the Supreme Court has not confronted this issue directly, a survey of the Court's group boycott decisions in which the per se rule was invoked "confirms that it is attempts by competitors to exclude horizontal competitors which trigger the per se rule." Comment, Protest Boycotts Under the Sherman Act, 128 U.Pa.L.Rev. 1131, 1151 (1980). In Klor's, for example, the unlawful conduct was the attempt by one retailer to push a competitor out of the market. Similarly, in Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), the plaintiff, a gas burner manufacturer, complained that the arbitrary denial of a gas association's "seal of approval" prevented the company from competing with the manufacturer-members of the association. The Supreme Court held that the plaintiff was entitled to a trial on these allegations. In United States v. General Motors Corp., 384 U.S. 127, 79 S.Ct. 705, 3 L.Ed.2d 741 (1966), a scheme in which retailers induced a manufacturer not to sell to competing discount retailers was held illegal per se under the Sherman Act. And in Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), the Court concluded that the per se rule was appropriate where one group of manufacturers attempted to induce retailers not to buy from another group of manufacturers. Significantly, while the Supreme Court recently declined to limit, for purposes of the McCarran-Ferguson Act, the definition of the term "boycott" to "those combinations which target competitors of the boycotters as the ultimate objects of a concerted refusal to deal," the Court did intimate that it was willing to distinguish between those boycotts that were unreasonable per se and those that were not. St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 542, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978). Noting the continuing controversy over the definition of the per se illegal boycott, the Court declared: "But the issue before us is whether the conduct in question involves a boycott, not whether it is per se unreasonable." Id. See Bauer, Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination, 79 Colum.L.Rev. 685, 691-92 (1979).
 
 
 34
 Our circuit is among those that have attempted to limit the application of the per se rule to the "classic" boycott. As we stated in DeFilippo v. Ford Motor Co., 516 F.2d 1313, 1317 (3d Cir.) cert. denied, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975):
 
 
 35
 The inquiry in any case seeking to apply this rule of per se unreasonableness must be whether or not the activities of defendants properly fall within the "group boycott" categorization.... "The term 'group boycott' ... is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the 'group boycott' and 'per se' labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed."
 
 
 36
 Id. at 1317-18 (quoting Worthen Bank & Trust Co. v. National Bank Americard, Inc., 485 F.2d 119, 125 (8th Cir. 1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974)).
 
 
 37
 In DeFilippo, we concluded, after surveying the relevant Supreme Court precedents, that a concerted activity constitutes a per se illegal "group boycott" only when " 'there (is) a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both.' " 516 F.2d at 1318 (quoting Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970)). There, the defendant, Ford Motor Company, had refused to consummate a "special terms" arrangement between it and one of its dealers, after other area dealers protested. Because this refusal did not deprive plaintiffs of the opportunity to become a Ford dealer, or to purchase products on the same basis as other dealers, we held that the concerted action at issue in the case "did not constitute a group boycott in the sense of a per se unreasonable restraint of trade." Id. at 1320 (emphasis added).
 
 
 38
 More recently, in Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978), we again faced the problem of defining the term "group boycott" and determining the bounds of its legality. In Sitkin, the plaintiff complained that the defendant had engaged in a sham bidding scheme with a third party whereby the defendant agreed that the third party would be awarded a contract to dismantle defendant's rayon plant if it matched the bid of the otherwise highest bidder. The Court declined to hold that this conduct constituted an illegal group boycott: "The controlling cases involve broad combinations and rather pervasive refusals to deal by a group of suppliers covering many transactions over an extended period of time.... We are not confronted with such a factual situation here. Plaintiffs have not brought to our attention any case where a court has found a per se violation of the Sherman Act on the basis of a concerted refusal to deal between a single seller and a single buyer." 575 F.2d at 446-47 (citations omitted).
 
 
 39
 In contrast, the Court indicated its willingness to apply the per se rule in Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979). There, the manufacturer of kitchen cabinets allegedly terminated its sales to a discount retailer at the urging of another competing retailer, who wished to maintain prices. Like Klor's and General Motors, the case involved the attempt of one competitor to squeeze out its direct competitor. "(A)lthough the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level." 595 F.2d at 168. Thus, we reversed the summary judgment entered in favor of the defendants on the ground that at trial a per se violation of the Sherman Act might be found. See Comment, Vertical Agreement as Horizontal Restraint: Cernuto, Inc. v. United Cabinet Corp., 128 U.Pa.L.Rev. 622 (1980).
 
 
 40
 Finally, in Conex, discussed supra, we addressed the question whether a group boycott in the labor context was per se unreasonable. There, we outlined a "core group of situations" in which group boycotts have been deemed illegal per se:
 
 
 41
 (1) horizontal combinations of traders at one level of distribution having the purpose of excluding direct competitors from the market, e.g., Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); (2) vertical combinations, designed to exclude from the market direct competitors of some members of the combination, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and (3) coercive combinations aimed at influencing the trade practices of boycott victims. E.g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Fashion Originators' Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).
 
 
 42
 602 F.2d at 522. See E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, 467 F.2d 178, 186-87 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).
 
 
 43
 In Conex, after holding that the Rules on Containers and the Dublin Supplement were not exempt from the antitrust laws, the Court concluded that the facts of the case did warrant the application of the per se rule. Specifically, we found that the rules had "horizontal, vertical, and coercive aspects": the goal of the union organization was "work acquisition" because the "union's efforts clearly were directed toward the elimination of teamster competition"; the rules "wholly bar" the plaintiffs from providing their services in the market in question; the "anticompetitive effect of (the) arrangement (was) clear"; nor was there "any suggestion in the record that the application of the Rules will in the long run have procompetitive rather than anticompetitive effects." In sum, the Court determined that the rules represented " 'agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.' " Conex at 522-23, (quoting National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)).
 
 C.
 
 44
 Applying the foregoing principles to the case at hand, we conclude that the agreement between Silver's and the Trade Councils should not be deemed unreasonable per se. A distillation of the facts at issue here makes it clear that this is not a classic group boycott; the defendants' conduct should not be proscribed until the factfinder has been given the opportunity to determine its reasonableness. Simply put, a small retailer has been picketed by a union. To preserve its business, the firm agrees to purchase union-made goods or services in the future. We cannot agree with Muko or the dissent that this is the kind of behavior against which the per se rule traditionally has been invoked. Unlike Klor's and General Motors, this is not a case in which one competitor, through concerted action with a supplier or customer, attempts to cut another, horizontal competitor out of the marketplace. Nor is there any suggestion of attempted price-fixing, as in Cernuto. Notwithstanding the dissent's assertion, which is not grounded on record evidence, that Muko "must be viewed as the representative of non-union labor," the fact remains that neither Silver's nor the Trades Councils was in competition with each other or with Muko. There is no evidence that Silver's goal was to affect Muko's business; rather, it is uncontradicted that Silver's sought only to retain the goodwill of its customers in a new market. The Councils' goal was to ensure payment of the prevailing union wage to Pittsburgh-area construction workers. The record is barren of anything to suggest that either of the defendants wished, through their concerted action, to gain an advantage over Muko in an economic or competitive sense. This fundamentally distinguishes the present case from Conex, which involved an agreement between the defendant longshoremen's union, common carriers, and stevedores to exclude from direct competition all the teamsters employed by the plaintiff freight consolidators.
 
 
 45
 We note, too, the limited nature of the restraint at issue here. Unlike Conex, in which the defendant union imposed a widespread restraint of trade, affecting the entire shipping industry, the "refusal to deal" in this case involved only one relatively small buyer: Silver's. Moreover, we fail to perceive the significant anticompetitive effects alleged by the appellant. Again, unlike Conex, the agreement did not have the necessary effect of destroying Muko's business; indeed, the evidence shows that Muko's profits increased during the time in question. Appendix at 127a. Silver's also appeared prepared to give Muko the job of constructing future restaurants if Muko employed union labor. Finally, procompetitive effects were demonstrated-Silver's gained a position in the otherwise crowded Pittsburgh-area fast food market.
 
 
 46
 The dissent points to a series of cases in an effort to support its view that Silver's agreement not to employ non-union contractors is unreasonable per se. None is apposite. Most of the cases cited-Klor's Fashion Originators', Radiant Burners, and Cernuto, discussed supra-involve horizontal restraints (or, perhaps more accurately, vertical restraints with horizontal effects) by direct competitors. Similarly, United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), involved a horizontal territorial restraint. Another case, National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), a suit brought by the Government to nullify a professional association's canon of ethics prohibiting competitive bidding, was decided under the rule of reason. Indeed, Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), overruled the per se rule of United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) that had previously governed vertical restraints. United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), cited by the dissent for the proposition that a procompetitive effect in one market will not excuse an anticompetitive effect in another, was a merger case under section 7 of the Clayton Act, 15 U.S.C. § 18. The defendants sought to defend their merger in part on the proposition that "if all the commercial banks in the Philadelphia area merged into one, it would be smaller than the largest bank in New York City." 374 U.S. at 370, 83 S.Ct. at 1745. While the Court rejected this argument as a justification for a merger, it in no way addressed the question whether procompetitive effects could be considered in making the initial determination whether conduct was so pernicious as to be illegal per se under section 1 of the Sherman Act. And, finally, in St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 542, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978), discussed supra, the Supreme Court explicitly declined to address the question whether all boycotts were unreasonable per se.
 
 
 47
 In sum, we have been referred to no case that suggests that the agreement at issue here is one "whose nature and necessary effect (is) so plainly anticompetitive that no elaborate study of the industry is needed...." Conex at 522-23. Accordingly, we hold that the district court did not err in instructing the jury to apply the rule of reason, rather than the per se standard, to the conduct in question in this case.
 
 IV.
 
 48
 We turn now to Muko's second contention in this appeal-that the district court erred in instructing the jury on the relevant product market.
 
 
 49
 At trial, Muko's expert testified that the relevant product market was the construction of fast food restaurants. Defendants contended that the relevant product market was the construction of small commercial buildings, including fast food restaurants. The trial judge instructed the jury that it could consider whether the construction of fast food restaurants was
 
 
 50
 a type of trade in which the contractors limit themselves or specialize in to the exclusion of other lines; is the construction of fast food restaurants, from what you have heard in the evidence here, a line of trade, a real line of trade in which somebody either devotes all his time, he doesn't do anything else, or a majority of his time or is that bigger? Do contractors in general-not necessarily the plaintiff here, all of them, do they regard this as an activity in which they devoted their time and energy and assets to so that, if that is blocked, they can't easily change to another line? ...
 
 
 51
 If this agreement puts a restraint only on fast food restaurants, is that sufficiently reasonable for your consideration, or can contractors who do fast food restaurants just as easily do convenience stores, 7-Eleven Stores, small business buildings, branch banks? Is the line of trade confined to restaurants, or is it a little bigger, to include, as has been argued here, small commercial buildings?
 
 
 52
 Appendix at 1253a-1254a.
 
 
 53
 Muko objects to the trial court's instruction in this respect because the charge "made definition of the market and reasonableness of the restraint dependent upon Muko's ability to compete in a market other than the one in which the alleged restraint occurred." Brief for Appellant at 21. It points to cases such as Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) and United States v. E.I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), arguing that the fact that "the defendant in DuPont was presumably able to make wrapping products other than cellophane" was not relevant to a determination of the product market: "The law does not, however, define either the product market or the reasonableness of a restraint in terms of the versatility of the alleged antitrust victim." Brief for Appellant at 33.
 
 
 54
 In a traditional section 2 monopolization case, the "product market" is defined in terms of cross-elasticity of demand-can the consumer of the product of an alleged monopolist switch easily to a substitute product, thereby undercutting the monopolist's power? See Brown Shoe, supra. As this Court held in SmithKline Corp. v. Eli Lilly and Co., 575 F.2d 1056 (3d Cir.), cert. denied, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978):
 
 
 55
 defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability-actual or potential-to take significant amounts of business away from each other. A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market.
 
 
 56
 575 F.2d at 1063. See also Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1349 (3d Cir. 1975) (emphasizing "interchangeability" of products).
 
 
 57
 It should be remembered that this case is not a monopolization case; nor is it a restraint of trade by producers of the product. Here, the consumers of Muko's product (construction services) have contracted to restrain trade. Thus the market must be analyzed not in terms of cross-elasticity of demand for the product, but of cross-elasticity of supply. That is, can Muko easily substitute one product (any type of small commercial building) for another (fast food restaurants)?
 
 
 58
 Under this analysis, Muko's argument fails to withstand scrutiny. The district court did not instruct the jury to decide whether, if pushed out of the "relevant product market," Muko could enter a new, unrelated market. It simply asked the jury to determine whether Muko's "line of trade" was confined to fast food restaurants or whether it included other sorts of small commercial buildings. We find no error in this instruction.
 
 V.
 
 59
 To summarize, we hold that the district court correctly instructed the jury on the rule of reason standard as well as on the relevant product market. Accordingly, the order of the district court, entering judgment for the defendants, will be affirmed.[12]
 
 
 60
 SLOVITER, Circuit Judge, dissenting.
 
 
 61
 My difference with the majority is narrow but fundamental. I agree with the majority that the precedent of Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), Consolidated Express, Inc. v. New York Shipping Association, Inc., 602 F.2d 494 (3d Cir. 1979), vacated and remanded on other grounds, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980), and Muko I compels the conclusion that "once it is ascertained that union activity falls outside the protection of the labor exemption, a court must apply traditional antitrust principles in determining whether the activity in question violates the antitrust laws." Typescript op. at 11. I disagree with the majority that the application of traditional antitrust principles to the agreement found by the jury in this case supports the trial court's instruction to the jury that the rule of reason rather than the per se standard must be applied.
 
 
 62
 Although the parties disagree on the inferences to be drawn from the evidence, the jury could have found that at the meeting on November 1, 1973, representatives of Silver's and the Trades Councils reached an agreement, the substance of which was reflected in the letter sent by Silver's Vice-President within a week thereafter, that Silver's would use only union contractors certified by the Trades Councils in the construction of the Silver's restaurants. Interrogatory 1 to the jury asked "Did Long John Silver's and the Trades Councils enter into an agreement or combination to refuse to grant construction contracts to non-union builders, including Muko? " (emphasis added). It replied in the affirmative. Thereafter, by its reply to Interrogatory 2, the jury found that the effect of the agreement between Silver's and the Trades Councils was to impose a restraint on free competition "beyond that which would follow from the elimination of competition based on wage rates and working conditions." In other words, the defendants entered into an agreement, and that agreement fell outside the nonstatutory labor exemption.
 
 
 63
 The majority gives four reasons for its unwillingness to apply the per se standard usually applicable to concerted refusals to deal: (1) "neither Silver's nor the Trades Councils was in competition with each other or with Muko," and no evidence suggests that either defendant wished, through their concerted action, to gain an advantage over Muko in an economic or competitive sense; (2) "the 'refusal to deal' in this case involved only one relatively small buyer: Silver's", rather than the imposition of a "widespread restraint of trade"; (3) "the agreement did not have the necessary effect of destroying Muko's business," since his profits increased during the time in question and Silver's might have permitted Muko to construct future restaurants if Muko employed union labor; and (4) "procompetitive effects were demonstrated" because Silver's gained a position in the otherwise crowded Pittsburgh-area fast food market. At 432. I believe the grounds on which the majority bases its decision are either factually erroneous or legally irrelevant. Those grounds will be considered seriatim.
 
 
 64
 (1) The principal reason relied upon by the majority, both in its legal analysis and in its application of the legal principles to the case at hand, is its view that "this is not a case in which one competitor, through concerted action with a supplier or customer, attempts to cut another, horizontal competitor out of the marketplace." In the same paragraph, the majority enunciates its conclusion that there was no anticompetitive intent underlying the agreement. Thus, the majority states, Silver's "goal" was not to affect Muko's business but "to retain the goodwill of its customers in a new market"; the Councils' "goal was to ensure payment of the prevailing union wage". Neither defendant was, according to the majority, "in competition ... with Muko" and neither sought "to gain an advantage over Muko in an economic or competitive sense." At 432 (emphasis in original).
 
 
 65
 The legal and factual flaws underlying the majority's analysis are numerous. It is of no small significance that in dealing with the definition of a "boycott", as that term is used in the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq. (1976), the Supreme Court rejected the contention that "boycott" embraces "only those combinations which target competitors of the boycotters as the ultimate objects of a concerted refusal to deal." St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 542, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978) (emphasis in original). The Court noted instead:
 
 
 66
 As the labor-boycott cases illustrate, the boycotters and the ultimate target need not be in a competitive relationship with each other. This Court also has held unlawful, concerted refusals to deal in cases where the target is a customer of some or all of the conspirators who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the sellers. See, e.g., Paramount Famous Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930); United States v. First Nat. Pictures, Inc., 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151 (1930); Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308 (1923). See also Anderson v. Shipowners Assn., 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926). As the Court put it in Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951), "the Sherman Act makes it an offense for (businessmen) to agree among themselves to stop selling to particular customers."
 
 
 67
 Id. at 543-44, 98 S.Ct. at 2930-31 (footnote omitted). Although the majority states that in the St. Paul case, "the Court did intimate that it was willing to distinguish between those boycotts that were unreasonable per se and those that were not", at 430, I would not be comfortable with that reading of the case in light of the Supreme Court's express disclaimer of any such intimation. After referring to the attempt by commentators to define those boycotts to which the per se approach should be limited, the Court stated, "We express no opinion, however, as to the merit of any of these definitions." Id. at 542 n.14, 98 S.Ct. at 2930 n.14. Its express rejection of a limitation of the boycott definition to those agreements that target competitors undercuts the legal foundation upon which the majority opinion is constructed.
 
 
 68
 Even if use of a per se analysis is justified, as the majority suggests, only when there is some competitive impact, the majority's failure to recognize such an impact stems from a somewhat naive perception of the marketplace in which this agreement was wrought. The Trades Councils are representatives of union labor; Muko, a non-union contractor, must be viewed as the representative of non-union labor. Thus the parties represent two strong competitive forces in the Pittsburgh area construction industry. If the Trades Councils succeed in their effort to limit the construction work available to firms using non-union labor, the union workers will have gained a competitive advantage over the non-union workers. This is an economic conflict in the most basic sense.
 
 
 69
 Because the true antagonists are workers, not businesses, "strong labor policy favor(s) the association of employees to eliminate competition over wages and working conditions." Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. at 622, 95 S.Ct. at 1835. Notwithstanding the actual or potential anticompetitive effects that flow from such agreements, the non-statutory labor exemption from the antitrust laws which is applied even to union-employer agreements is founded on the recognition that "labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions." Id. But once the agreement has effects which extend beyond the lessening of business competition based on differences in wages and working conditions, we are compelled to apply traditional antitrust analysis.
 
 
 70
 Significantly, the unions in this case did not use the customary method by which organized labor attempts to effectuate its goals regarding wage rates and working conditions, which would have been to seek to organize Muko's employees. Instead, for reasons which do not appear on the record, the unions circumvented that route and confined themselves to pressuring Silver's not to do business with Muko merely because Muko employed their competitors, the non-union workers. It is because this effort had an effect, as the jury found, beyond that on wages and working conditions, that the Trades Council-Silver's agreement goes beyond the recognized labor protection. As such, it is indistinguishable from similar agreements which have been placed in the per se category.
 
 
 71
 As we pointed out in Consolidated Express, defendants cannot avoid per se illegality merely because they had no anticompetitive intent. We stated there, in rejecting the relevance of the factor of "goal" on which the majority here relies, "A showing of a specific intent to harm one's competitors or restrain competition need not be shown." 602 F.2d at 523. In effect, the majority's use of the "goal" of the Trades Councils "to ensure payment of the prevailing union wage" as a reason for the application of the rule of reason standard is simply another way of saying that special consideration should be given to this agreement because it involved union activity. This is inconsistent with the majority's own recognition that traditional antitrust principles must apply once the nonstatutory labor exemption is found to be inapplicable, and is inconsistent with this court's holding in Consolidated Express, Inc. v. New York Shipping Association, Inc., 602 F.2d 494, and the Supreme Court's holding in Connell Construction Co. v. Plumbers & Steamfitters Local 100, supra.
 
 
 72
 Further, the majority misperceives the thrust of the recent efforts to define more precisely the type of concerted refusals to deal with warrant per se treatment. It is true, as the majority suggests, that there is some resistance to application of a per se standard to all refusals to deal. But the leading academic commentators agree that a classic boycott, one which entails exclusionary conduct for economic benefit, merits per se treatment. See, e.g., L. Sullivan, Handbook of the Law of Antitrust 256 (1977); 3 P. Areeda & D. Turner, Antitrust Law P 836, at 351-52 (1978). What could be more exclusionary or fit more into the mold of a classic boycott than an agreement to exclude another firm (Muko and other non-union contractors) from a market (construction of Silver's restaurants) because it does not use union labor?
 
 
 73
 To be sure, it has not always been easy for the courts to apply the per se rule when the conduct itself could be considered to have a redeeming value. Thus, one might justify concerted refusals to deal when the effort is to eliminate design piracy, to prevent production of inferior work and insure ethical behavior, or to insure that potentially dangerous products are safe, useful and durable. But when met with each such rationale, the Supreme Court held that such potential justification does not warrant consideration of the combination by any standard less than the per se one applicable to concerted refusals to deal. See Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); National Society of Professional Engineers v. United States, 435 U.S. 679, 38 S.Ct. 242, 244 L.Ed. 683 (1978);[1] Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam).
 
 
 74
 There has been a recent group of cases, primarily those in connection with professional sports, where the courts have recognized that the necessity of combined action makes the field inappropriate for per se treatment. Obviously, if two clubs do not agree to be at the same field at the same time, to the exclusion of their competitors, there would hardly be a game in town. Other forms of combination within sports leagues are equally difficult to fit into the traditional antitrust analysis. See, e.g., Molinas v. National Basketball Association, 190 F.Supp. 241, 243-44 (S.D.N.Y.1961). Antitrust professors delight in pushing their students to the outer limit of analysis by posing hypothetical (and some not-so-hypothetical) situations in which consumer boycotts are organized against grape growers, non-ERA states, or racial discriminators to test if the students are willing to apply a laxer antitrust standard in these situations than when businesses combine to refuse to deal with other businesses. Whatever the merits of making a distinction along these lines, it has no application in the present situation. Indeed, in the case of the type of agreement at issue here, akin to a hot cargo agreement, Congress has already determined its lack of redeeming value since, in the labor context, such an agreement is ordinarily banned. See NLRA § 8(e); Consolidated Express, Inc. v. New York Shipping Association, Inc., 602 F.2d at 524. Thus I disagree with both the majority's restrictive interpretation of the scope of the per se standard in antitrust cases and its failure to apply what have heretofore been traditional antitrust principles to combinations of labor and business which go far beyond labor's recognized exemption.
 
 
 75
 (2) The majority's second reason for applying the rule of reason here focuses on "the limited nature of the restraint" which "involved only one relatively small buyer: Silver's." The facts in this case simply do not fit into the majority's view of a single seller, a single buyer, and a single transaction. Arrayed on one side of the agreement were the Trades Councils representing all of the construction unions in six Pennsylvania counties, Allegheny County and the five surrounding counties. On the other side of the agreement was Silver's, which as of the trial date had constructed nineteen additional restaurants in the Western Pennsylvania area. At stake in the agreement was the considerable business represented by this construction, hardly similar to the single transaction to which we referred in Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978), cited by the majority. In Sitkin, which did not involve a classic agreement not to deal, the agreement found by the jury was one involving a sham bidding scheme for one transaction, the sale of scrap of a building damaged by a hurricane. That agreement did not fall within one of the categories which the Supreme Court has held must be construed under the per se standard and was therefore one to be evaluated under the rule of reason standard.
 
 
 76
 In this case, on the contrary, the restraint of trade was not "limited", as the majority suggests, but was found by the jury to be directed to "non-union builders, including Muko" who were the object of the agreement not to deal. Thus, this case must be viewed in a light far different from that seen by the majority, even were we free to gloss over the precedent of Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), where the Court stated of a concerted refusal to deal,
 
 
 77
 (I)t is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups.
 
 
 78
 Id. at 213, 79 S.Ct. at 710 (footnote omitted).
 
 
 79
 Further, the majority's apparent view that per se analysis is inappropriate because only one "relatively small buyer" was involved is inconsistent with this court's opinion in Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979), also authored by Judge Adams, where we held that a manufacturer's withdrawal of its line of kitchen cabinets from the plaintiff dealer at the instigation of a competitor stated a per se violation of the antitrust laws. In Cernuto there was no "widespread restraint of trade;" indeed we recognized that the impact may solely have been in the market for that manufacturer's cabinets, rather than in the general market for kitchen cabinets. Id. at 166. Nonetheless, we rejected the contention that the rule of reason should be applied.
 
 
 80
 The jury's affirmative response to Interrogatory 1 reflects its finding that there was an agreement between Silver's and the Trades Councils. In Muko I we suggested how such an agreement should be viewed when we stated, in rejecting the defendants' contention that the evidence failed to support an antitrust claim,
 
 
 81
 A factfinder could have found an agreement to exclude nonunion contractors from the Silver's construction market, a significant interstate market consisting of twelve construction projects. The premise of both the majority and minority opinions in Connell is that absent an exemption such an agreement may be the basis of a federal antitrust claim. The jury might have found a concerted refusal to deal with a class of contractors of which Muko is a member. But whether the evidence here is viewed as capable of sustaining a finding of a group boycott, to which a per se rule would apply, or some lesser restraint to which a rule of reason analysis might apply, it was sufficient to take Muko's case to the jury.
 
 
 82
 609 F.2d at 1376 (emphasis added). Once the jury found "a concerted refusal to deal with a class of contractors of which Muko is a member", it follows, as we previously recognized, that the agreement must be characterized as a group boycott and is one to which the per se rule applies.
 
 
 83
 (3) The third ground relied upon by the majority, that "the agreement did not have the necessary effect of destroying Muko's business", is legally irrelevant. The entire purpose of utilization of a per se rule is to avoid the necessity by plaintiffs to show the anticompetitive effects of the conspiracy. See Cernuto, Inc. v. United Cabinet Corp., 595 F.2d at 166. The thrust of the inquiry must be directed to whether the agreement is one which falls within the category of agreements classified as per se, not whether anticompetitive effects have been shown in the specific case. As we stated in Consolidated Express, Inc. v. New York Shipping Association, Inc., 602 F.2d at 523,
 
 
 84
 If a per se violation has been established, the court will already have found that "the nature and necessary effect" of the challenged conduct is "plainly anticompetitive." National Society of Professional Eng'rs v. United States, 435 U.S. at 690, 98 S.Ct. at 1364 (emphasis added). Once that fact has been established, all that need be shown is that the charged anticompetitive acts were in fact performed by the defendant.
 
 
 85
 If application of the per se standard were to be limited to those cases in which plaintiffs have shown the anticompetitive effects of the conspiracy, there would be no need to establish any per se rule. The extent of injury, if any, suffered by Muko is evidence directed to the amount of damages to which he would be entitled rather than to the standard by which the conduct should be judged. The "necessary effect" of the agreement found by the jury, which was to exclude Muko and other non-union contractors from the construction of Silver's restaurants, is inevitably exclusionary. It thus falls within the category of "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality-they are 'illegal per se.' " National Society of Professional Engineers v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).
 
 
 86
 (4) The final ground relied upon by the majority, that "procompetitive effects were demonstrated" because Silver's gained a position in the otherwise crowded Pittsburgh-area fast food market, also cannot withstand analysis. The self-interest of Silver's, in avoiding union pickets and displeasure, is hardly synonymous with a "procompetitive effect". Even if there were evidence of such an effect, antitrust cases have always rejected the premise that a procompetitive effect in one market will excuse an anticompetitive effect in another. See, e.g., United States v. Topco Associates, Inc., 405 U.S. 596, 609-11, 92 S.Ct. 1126, 1134-35, 31 L.Ed.2d 515 (1972); United States v. Philadelphia National Bank, 374 U.S. 321, 370, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915 (1963). During the almost 100 years of antitrust enforcement in this country, antitrust defendants have often sought to rationalize their conduct either on the ground that some benign and beneficent purpose is served or on the ground that competition, rather than being hurt, is enhanced. In the rare instances where the latter ground has been accepted as the basis for placing a class of agreements into the rule of reason category, the courts have not looked to whether the individual self-interest of one of the parties to the agreement would be served, as the majority does in this case, but to whether the competition that may flow from such agreements in general warrants a judgment that they could have economic utility. See Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 54-59, 97 S.Ct. 2549, 2559-2562, 53 L.Ed.2d 568 (1977). In contrast, the majority has proffered no legally cognizable basis for application of the rule of reason to an agreement not to use non-union contractors.
 
 
 87
 Since I believe none of the reasons given by the majority to support the use of a rule of reason standard when unions conspire with business to exclude a non-union firm from the market withstands analysis, I conclude that the underlying rationale for the majority's approach must stem from its discomfort with the application of traditional antitrust rules in the labor context. Judge Adams candidly set forth his concern in his concurring opinion in Muko I, 609 F.2d at 1376-77. While there may be some merit in that position, it is, as Judge Adams recognized, one which we, as an inferior court, are not free to take in light of the Supreme Court's decision in Connell. Further, were we free to examine the issue anew, I have grave question whether the extension of labor's exemption from the antitrust laws should be accomplished by the courts or whether it should not be left to Congress.
 
 
 88
 For the aforesaid reasons, I would reverse the judgment of the district court, and remand for retrial so that the jury may apply a per se standard to the concerted refusal to deal which it already found existed and which it found extended beyond labor's nonstatutory exemption from the antitrust laws.
 
 
 
 [1]
 Silver's argues that these two points cannot be assigned as error under Fed.R.Civ.P. 51 because Muko failed to present timely objections to the district court. While Muko may not have formally objected to the jury charge, it is clear from the record that the judge was made aware of Muko's position "before the jury retire(d) to consider its verdict." See, e.g., Appendix 63a-66a; 98a-102a; 1138a; 1220a-1221a. We therefore conclude that Muko did not waive its right to appeal under Rule 51. See United States v. General Motors Corp., 226 F.2d 745, 750 (3d Cir. 1955)
 
 
 [2]
 The National Labor Relations Board had previously held the rules to be a violation of § 8(e) of the NLRA, 29 U.S.C. § 158(e). That section declares that it "shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person...." In NLRB v. International Longshoremen's Ass'n, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980), however, a related case on certiorari from the District of Columbia Circuit, the Supreme Court held that, in determining that the agreement implementing the Rules on Containers violated § 8(e), the Board had applied an incorrect legal standard. The Court therefore remanded that case to the Board for further proceedings, and subsequently vacated and remanded our decision in Conex for further consideration in light of International Longshoremen's Ass'n, 448 U.S. at 902, 100 S.Ct. at 2305, 65 L.Ed.2d 289. On remand, we ordered Conex stayed pending disposition of the § 8(e) charge by the Board. 641 F.2d 90 (3d Cir. 1981). We noted, however, that those aspects of our earlier decision not predicated on a finding that § 8(e) had been violated-including, presumably, our discussion of the proper standard of antitrust scrutiny-were not affected by the vacation and stay. 641 F.2d at 94
 
 
 [3]
 Several commentators appear to share Professor Handler's view. See, e.g., Casey & Cozzillio, Labor-Antitrust: The Problems of Connell and a Remedy that Follows Naturally, 1980 Duke L.J. 235, 278; Comment, Consolidated Express: Antitrust Liability for Illegal Labor Activities, 80 Colum.L.Rev. 645, 660-63 (1980). Cf. Leslie, Principles of Labor Antitrust, 66 Va.L.Rev. 1183, 1222-24 (1980) (rejecting both the per se and the rule of reason standards and urging that union-imposed restrictions should be deemed unlawful "only if they involve price-fixing, output-restricting, or market-sharing arrangements")
 
 
 [4]
 Rather than attempting to distinguish Professional Engineers, Professor Handler suggests that more recent Supreme Court decisions "point( ) toward a rejection of the Professional Engineers test." 81 Colum.L.Rev. at 512 n.299 (citing Broadcast Music, Inc. v. CBS, Inc., 441 U.S. 1, 23-26, 99 S.Ct. 1551, 1564-1566, 60 L.Ed.2d 1 (1979))
 
 
 [5]
 We are thus unpersuaded by Muko's recitation of the legislative history of § 8(e) of the NLRA, (the so-called "hot cargo" provision) which indicates Congress' intent to make hot cargo agreements illegal per se under the labor laws. Brief for Appellant at 16-18. See note 2 supra. Even assuming that the defendants' conduct would be deemed illegal under § 8(e), we see no reason to presume that Congress intended the same conduct to be ipso facto violative of the antitrust laws, which were enacted at a different time, for a different purpose, and which provide for sharply different relief. See Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 634, 95 S.Ct. 1830, 1840, 44 L.Ed.2d 418 (1975)
 
 
 [6]
 A number of other courts appear to have adopted a similar approach. See, e.g., Ackerman-Chillingworth v. Pacific Electrical Contractor Assoc., 579 F.2d 484, 490 n.7 (9th Cir. 1978) (applying the rule of reason to the facts at issue, but noting: "in the absence of any of the competitive injuries wrought by the classic-type boycotts traditionally considered as unlawful per se, the district court properly rejected application of the per se rule"); Smith v. Pro Football, Inc., 593 F.2d 1173, 1177-82 (D.C.Cir.1978) (applying the "traditional framework of analysis under § 1 of the Sherman Act," court concludes that the defendants' conduct should be tested under the rule of reason because it cannot be considered a classic group boycott, which would require invocation of the per se rule); Mackey v. National Football League, 543 F.2d 606, 618-19 (8th Cir. 1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (same). But see Berman Enterprises Inc. v. Local 333, International Longshoremen's Assoc., 644 F.2d 930, 936 (2d Cir. 1981) (concluding without discussion that the rule of reason "would be applicable"); South-East Coal Company v. Consolidation Coal Company, 434 F.2d 767, 775 (6th Cir. 1970) (holding that "when a labor union and an employer enter into a plan or scheme of the type which results in the union closing its exemption from liability under the antitrust law, that plan or scheme is by definition an unreasonable restraint under the antitrust laws"). Cf. Commerce Tankers Corp. v. National Maritime Union of America, 553 F.2d 793, 802 (2d Cir. 1977) (court remands for consideration of antitrust claim without deciding which standard applies, but notes that there is "at least a substantial question whether a per se approach under the antitrust laws is applicable in the case of a non-exempt labor activity")
 
 
 [7]
 15 U.S.C. § 1 (1976) (prohibiting "(e)very contract, combination ... or conspiracy in restraint of trade.")
 
 
 [8]
 See National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (Brandeis, J.) ("(T)he court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.")
 
 
 [9]
 See also White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), in which the Supreme Court, facing for the first time the question of the legality of a vertical territorial restraint, stated:
 Horizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition. A vertical territorial limitation may or may not have that purpose or effect. We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business ... and within the "rule of reason." We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack ... any redeeming virtue" ... and therefore should be classified as per se violations of the Sherman Act.
 372 U.S. at 263, 83 S.Ct. at 702 (emphasis added) (citations omitted).
 
 
 [10]
 See, e.g., Bauer, Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination, 79 Colum.L.Rev. 685, 705 (1979) (advocating invocation of the per se rule only when the conduct is "intended to coerce or exclude other entrepreneurs" and is "likely to have anticompetitive effects"); McCormick, Group Boycotts-Per Se or Not Per Se, That is The Question, 7 Seton Hall L.Rev. 703 (1976); Woolley, Is a Boycott a Per Se Violation of the Antitrust Laws?, 27 Rutgers L.Rev. 773 (1974); Comment, Protest Boycotts Under the Sherman Act, 128 U.Pa.L.Rev. 1131, 1150-52 (1980); Comment, Boycott: A Specific Definition Limits the Applicability of a Per Se Rule, 71 Nw.U.L.Rev. 818 (1977)
 
 
 [11]
 In Smith v. Pro Football, Inc., 593 F.2d 1173 (D.C.Cir.1978), for example, the District of Columbia Circuit defined the "classic group boycott" as
 a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates.
 593 F.2d at 1178 (footnote omitted). The Court held that the National Football League player draft was "not the type of group boycott that traditionally has elicited invocation of a per se rule." Id. at 1179. Two factors distinguished the player draft from the classic group boycott. First, the NFL clubs that had combined were not competitors in any economic sense; no team was "interested in driving another team out of business." Id. Second, the NFL clubs had not combined "to exclude competitors or potential competitors from their level of the market." Id. (emphasis in original). See also Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).
 
 
 [12]
 Because of our disposition of this case, it is unnecessary for us to address the questions raised in defendants' conditional cross-appeals
 
 
 [1]
 Although the majority characterizes the Professional Engineers case as one decided under the rule of reason, the Supreme Court itself in Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980) (per curiam), included that case among those applying a per se rule